IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DILAN ABREU, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. |
| v. | ) | |
| | ) | Jury Trial Demanded |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## **COMPLAINT**

Plaintiff Dilan Abreu, by his undersigned counsel, complains against the City of Chicago as follows:

### **Introduction**

1.      Dilan Abreu is a Hispanic and Puerto Rican bricklayer who has devoted four decades of his career to the City of Chicago, including nearly two decades in the City's Department of Water Management.

2.      Since 2010, Abreu has been subjected to a hostile work environment and denied overtime opportunities based on his race and national origin.  Over the course of seven years, the former Superintendent of the Water Department's North District, Paul Hansen, called Abreu dozens of slurs, including "stupid fucking spic," "dumb Puerto Rican," "pork chop," and "Spanish-speaking nigger."  Hansen also instituted an unequal compensation system in which overtime and other premium pay opportunities went almost exclusively to white employees -- and none to Abreu for many years.

3.     In September 2016, Hansen physically assaulted Abreu while on a jobsite, which led Abreu to file a formal complaint with the City of Chicago.  Although Abreu's complaint described Hansen's harassment and discrimination in detail, the City did not take any action to stop Hansen's conduct in the months that followed.

4.     In May 2017, the City's Inspector General published a report that condemned the Water Department for "an unrestricted culture of overtly racist and sexist behavior and attitudes," which was widely reported in the press.  Ultimately, at least seven high-ranking Water Department employees were fired or resigned to avoid being fired, including the Commissioner, the Managing Deputy Commissioner, and Hansen.

5.     Abreu filed a charge of discrimination with the EEOC in June 2017, alleging harassment dating back to 2010.  After Abreu filed his charge, his supervisors in the Water Department retaliated against him repeatedly.

6.     At a City Council hearing in 2018, nearly two dozen current and former employees testified about racial harassment, discrimination, and ongoing retaliation in the Water Department.  Mayor Rahm Emanuel later acknowledged that the Water Department's racist culture persisted despite a change in leadership.

7.     Abreu alleges a hostile work environment, discrimination, and retaliation in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*("Title VII"); 42 U.S.C. § 1981 via 42 U.S.C. § 1983 ("Section 1981"); the Illinois Civil Rights Act of 2003 ("ICRA"), 740 ILCS 23/1 *et seq.*; and the First and Fourteenth Amendments of the U.S. Constitution via 42 U.S.C. § 1983.

8.     Abreu seeks redress for years of emotional distress and economic injuries caused by these violations, which continue to this day.

**Jurisdiction and Venue**

9.　This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 2000e-5(f), and 42 U.S.C. § 1988, and supplemental jurisdiction pursuant to 42 U.S.C. § 1367.

10.　Venue is proper pursuant to 28 U.S.C. §1391 and 42 U.S.C. §2000e-5(f) because the defendant resides within this judicial district, and because the events or omissions giving rise to Abreu's claims occurred within this judicial district.

**Parties**

11.　Plaintiff Dilan Abreu is a Hispanic and Puerto Rican bricklayer in the City of Chicago's Department of Water Management.  He has worked for the City since 1979 and the Water Department since 2000, and he has been a member of Bricklayers Local 21 since at least 2004.  He resides in Chicago, Illinois.

12.　Defendant City of Chicago is a municipal corporation organized under the laws of the State of Illinois.

**Factual Allegations**

A.　**Background on the Water Department**

13.　The City of Chicago's Department of Water Management delivers drinking water to residents of Chicago and 125 suburban communities, and removes waste water and storm runoff through the sewer system.

14.　In 2018, the Water Department had 1,895 employees and a budget of $293,398,931.

15.　The Water Department operates under the direction of a Commissioner who is appointed by the Mayor and approved by the City Council.

3

16.     The Commissioner serves at the pleasure of the Mayor.  In consultation with the Mayor and other final policymakers within the City, the Commissioner establishes policy for the Water Department.

17.     The Commissioner appoints the Water Department's First Deputy Commissioner, Managing Deputy Commissioners, and Deputy Commissioners.  These Deputy Commissioners also have final policymaking authority.

18.     The Commissioner and Deputy Commissioners have final policymaking authority over the terms and conditions of employment for all Water Department employees.

19.     The Water Department is divided into three districts:  the North District, the Central District, and the South District.

20.     Each district is overseen by a Superintendent, who exercises final policymaking authority over the terms and conditions of employment in the district, including policies for assigning overtime and other premium pay, as well as establishing the workplace culture and environment.

**B.     The Superintendent of the North District, Paul Hansen, harassed Abreu for seven years, including with racial slurs and ultimately a physical threat.**

21.     Abreu has worked for the City for 40 years, and the Water Department for almost 20 years.

22.     Abreu first began working for the City in 1979.  He started as a laborer in the Sewer Department, then transferred to Streets and Sanitation, where he remained for a number of years.

23.     One of Abreu's supervisors in Streets and Sanitation was Bill Bresnahan.  While most of Abreu's supervisors in Streets and Sanitation were fair and respectful, Bresnahan was not.  Bresnahan made hostile comments to Abreu (*e.g.*, "You don't belong here").  Bresnahan later became Managing Deputy Commissioner of the Water Department.

4

24.     In 2000, Abreu applied for and obtained a bricklayer job with the Water Department.  He started in the Central District.  When a bricklayer in the North District retired, he applied for and received a transfer to the North District.

25.     Paul Hansen became Superintendent of the North District in December 2010. Before Paul Hansen became Superintendent of the North District, Abreu had never been disciplined.

26.     Over a period of years, Hansen harassed Abreu and denied him overtime opportunities because of his race and national origin.

27.     Hansen called Abreu "spic" many times.  As he was walking away after a conversation with Abreu, Hansen would often say, "That stupid fucking spic."  Hansen also said to Abreu, "Spic.  You're just like those fucking niggers."

28.     Hansen called Abreu "spic" over a dozen times, both in the yard and on worksites.

29.     Hansen also harassed Abreu for being Puerto Rican.  Hansen called him "dumb Puerto Rican" and "pork chop" (a reference to the stereotype that Puerto Ricans like pork).  He also said, "Go back to the island. You don't belong here," and "You're the dumbest people there is."  Hansen used these slurs dozens of times.

30.     Hansen would often yell at Abreu and call him an "idiot" and a "dumb fuck."

31.     When Abreu had to visit Hansen's office for some reason, Hansen would blow smoke in his face.  Hansen knew that, as a cancer survivor, Abreu had difficulty breathing in smoke.

32.     Hansen racially harassed numerous Hispanic and African-American employees in the Water Department, some of which Abreu witnessed.  Hansen's racial harassment of other employees contributed to the hostile work environment Abreu experienced.

33. For instance, Hansen regularly called Richard Pacheco -- a Hispanic and Puerto Rican laborer -- "spic" and "chop." The harassment caused Pacheco to transfer out of the North District for a period of time.

34. Abreu heard Hansen call multiple African-American employees "niggers."

35. Hansen's conduct was sufficiently severe and pervasive to alter the conditions of Abreu's employment and create a hostile work environment.

36. Abreu perceived the work environment as hostile.

37. Hansen's harassment continued until his last day in office, May 11, 2017, when he said to Abreu, "You're nothing but a Spanish-speaking nigger."

38. Abreu complained about the Water Department's racist culture, and specifically Paul Hansen, long before it was reported in the press (*see infra* at ¶¶ 43-44 & 60-63, detailing press coverage of Hansen and the Water Department). In October 2016, Abreu reported a complaint to the City's Department of Human Resources after Hansen tried to push him into a six-foot-deep hole.

39. Abreu's official complaint with the City's Department of Human Resources, filed on November 2, 2016, described how Hansen had long harassed him because of his race and national origin.

40. In the months that followed, the City did not take any action to stop Hansen's harassment and discrimination. The City closed the investigation in July 2017.

C.    **For decades, the Water Department has fostered an unrestricted culture of overtly racist behavior and attitudes, from the former Commissioner on down -- a culture that enabled and encouraged Hansen's harassment of Abreu.**

41.    For seven years, Hansen harassed Hispanic and African-American employees with impunity. He was enabled by a culture of racist behavior and attitudes that permeates every level of the Department, from the former Commissioner to low-level employees.

42.    Because of this culture, Hispanic and African-American employees in the Water Department have long suffered widespread racial harassment and discriminatory terms and conditions of employment.

43.    The Water Department's racist culture came to public attention in May 2017, when the *Chicago Tribune* reported that Mayor Rahm Emanuel had forced three top officials to resign: Hansen, Superintendent of the North District; Bill Bresnahan, the Managing Deputy Commissioner and Abreu's former supervisor at Streets and Sanitation; and Barrett Murphy, the Commissioner.

44.    While investigating illegal gun deals, the City's Inspector General found racist e-mails on Hansen's computer and initiated a far-reaching investigation into the Water Department.[1]

---

[1] *See, e.g.*, Ray Long & Hal Dardick, *Gun Deal Emails Spurred City Probe into Racist, Sexist Water Department Messages*, Chi. Tribune, May 15, 2017, http://www.chicagotribune.com/news/local/politics/ct-chicago-water-department-gun-deal-emails-met-0516-20170515-story.html; Hal Dardick, Ray Long & Todd Lighty, *Chicago Water Commissioner Resigns Amid IG Probe into Racist, Sexist Emails*, Chi. Tribune, May 12, 2017, at http://www.chicagotribune.com/news/local/politics/ct-rahm-emanuel-staff-changes-met-0413-20170512-story.html.

45.     The Inspector General uncovered "an unrestricted culture of overtly racist and sexist behavior and attitudes within the department."  "[E]gregious, offensive racist and sexist emails" were "distributed by and among…senior levels of department management."[2]

46.     By the time the investigation was complete, at least seven high-ranking Water Department employees had been terminated or resigned.

47.     At a hearing of the City Council Committee on Human Relations on January 10, 2018, nearly two dozen current and former Water Department employees testified about racial harassment, different terms and conditions of employment, and retaliation for complaining about discrimination.[3]

48.     Numerous employees testified about severe and pervasive racial harassment, for example:

- Frank Coconate, a 28-year employee of the Water Department, testified, "My problem started when I started to be fair with the African Americans or as this administration called them, 'niggers.'  I was fair with the Hispanics who were called Spicniggers.  Hispanic niggers.  The Puerto Ricans especially."

- Patrick McDonough, a 20-year employee of the Water Department, testified, "I immediately noticed the vile racism that consumed the Department of Water Management.  The Hispanics were called choppers, and blacks, niggers.  Spics, shines, homies, home skillets and other names were par for the course."

49.     No witnesses denied these allegations about the Water Department's racially-hostile work environment.

---

[2] City of Chicago Office of Inspector General, *Quarterly Report: Second Quarter 2017* (July 2017).

[3] Fran Spielman, *Federal Judge Keeps Alive Lawsuit Alleging Water Management Racism*, Chi. Sun Times, Nov. 18, 2018, at https://chicago.suntimes.com/news/federal-judge-keeps-alive-lawsuit-alleging-water-management-racism/; Hal Dardick, *Racism, Sexism Persist at Chicago Water Department Despite Leadership Change, Workers Allege*, Chi. Tribune, Jan. 10, 2018, at https://www.chicagotribune.com/news/local/politics/ct-met-chicago-water-department-racism-hearing-20180110-story.html.

50.     In a written statement to the Committee, the new Commissioner of the Water Department, Randy Conner, acknowledged "past cultural issues" and assured the Committee that he had "instituted a zero-tolerance policy for any racism…among department management or employees."

51.     The City knew about the Water Department's racist culture years before Abreu's 2016 complaint and the Inspector General's investigation.

52.     Hispanic and African-American employees have complained about racial harassment and discrimination for years.  Employees complained to their supervisors and trade unions, the City's Department of Human Resources, and state and federal agencies.

53.     Before 2017, the Water Department did not require annual equal employment opportunity training for all employees.

54.     On May 15, 2017, Alderman Roderick Sawyer acknowledged that the "pervasive culture of racism at the Water Department" had been "an open secret for years."[4]

55.     On January 15, 2018, Mayor Emanuel acknowledged that the racist culture in the Water Department "has been around for decades" -- and persisted even after numerous senior-level employees had resigned.[5]

---

[4] Ray Long & Hal Dardick, *Gun Deal Emails Spurred City Probe into Racist, Sexist Water Department Messages*, Chi. Tribune, May 15, 2017, at http://www.chicagotribune.com/news/local/politics/ct-chicago-water-department-gun-deal-emails-met-0516-20170515-story.html.

[5] Craig Dellimore, *Emanuel Defends New Water Commissioner Amid Racist Culture complaints*, CBS Chicago, Jan. 15, 2018, at https://chicago.cbslocal.com/2018/01/15/emanuel-defends-new-water-commissioner-amid-racist-culture-complaints/.

D. **High-ranking Water Department employees exchanged numerous racially-offensive e-mails, including with Abreu's supervisor, Paul Hansen, who also displayed a racially-offensive photo in his office.**

56. Between 2013 and 2017, Barrett Murphy, William Bresnahan, Paul Hansen, and other high-ranking Water Department employees exchanged numerous racially-offensive e-mails.

57. Murphy, who is white, was the Commissioner of the Water Department.

58. Bresnahan, who is white, was the Managing Deputy Commissioner of the Water Department.

59. Hansen, who is white, was the Superintendent of the North District and Abreu's supervisor.

60. In February 2013, Murphy forwarded Hansen an e-mail "concern[ing] an 'urgent request' from ComEd to stop work near an alternate power line serving schools, a fire station and senior citizen homes until the main line was fixed so those facilities wouldn't lose their electricity feed if it were accidentally damaged." Hansen replied, "I think the only thing that the line does not feed is the center for the severely challenged negro midgets, you know the place, it's where we hired all those laborers from 7 years ago." Murphy forwarded Hansen's e-mail to another employee.[6]

61. In July 2013, Hansen received an e-mail from Frank Capuzi, an employee at the Illinois Workers' Compensation Commission, about a fake "Chicago Safari" tour through predominantly Hispanic and African-American neighborhoods. The e-mail "guaranteed" that the recipient would "see at least one kill and five crime scenes" and "lots and lots of animals in their

---

[6] Hal Dardick, Ray Long & Todd Lighty, *Newly Released Racist, Sexist Emails Show Scope of Scandal at Chicago's Water Department*, Chi. Tribune, July 14, 2017, at https://www.chicagotribune.com/news/local/politics/ct-chicago-water-department-emails-met-20170714-story.html.

natural habitat." An image attached to the e-mail "depict[ed] four white people in safari gear taking pictures of black people trying to break into a car."[7] Hansen forwarded this e-mail to high-ranking Water Department employees. In reply, one high-ranking employee described African Americans as "wild animals" who are "untamed."[8]

62. In March 2014, Hansen forwarded a joke to Bresnahan and other high-level employees with the punchline, "That one-legged nigger is a queer."[9] That same month, Hansen received an e-mail that "linked to an online video showing several Kenyans unsuccessfully trying to fly an aircraft they had built."[10] The e-mail read, "They are human beings. Just like us! Only 100 years later."

63. In July 2014, Hansen forwarded an e-mail to Murphy titled "Watermelon Protection." The e-mail "included an image that depicted a scarecrow, dressed in a white KKK robe and pointed hood, amid a field of watermelons."[11]

---

[7] Ray Long & Todd Lighty, *State Worker Retiring Amid Probe of Racist Emails in Water Department Scandal*, Chi. Tribune, July 28, 2017, at https://www.chicagotribune.com/news/local/politics/ct-water-department-racist-emails-capuzi-met-0730-20170728-story.html.

[8] City of Chicago Office of Inspector General, *Quarterly Report: Second Quarter 2017*, at 9 (July 2017); Fran Spielman, *City Supervisor Called African-Americans 'Wild Animals' in Email: IG*, Chi. Sun Times, July 17, 2018, at https://chicago.suntimes.com/news/city-computers-used-to-send-sexually-explicit-photos-video-ig-says/.

[9] Hal Dardick, Ray Long & Todd Lighty, *Newly Released Racist, Sexist Emails Show Scope of Scandal at Chicago's Water Department*, Chi. Tribune, July 14, 2017, at https://www.chicagotribune.com/news/local/politics/ct-chicago-water-department-emails-met-20170714-story.html.

[10] Hal Dardick, *City Water Department Emails Reveal Racial Insensitivity, Sexism*, Chi. Tribune, June 2, 2017, at https://www.chicagotribune.com/news/local/politics/ct-water-department-scandal-emails-met-0603-20170602-story.html.

[11] Hal Dardick, Ray Long & Todd Lighty, *Newly Released Racist, Sexist Emails Show Scope of Scandal at Chicago's Water Department*, Chi. Tribune, July 14, 2017, at https://www.chicagotribune.com/news/local/politics/ct-chicago-water-department-emails-met-20170714-story.html.

64.    Hansen, Bresnahan, and Murphy exchanged numerous other racially-offensive e-mails between 2014 and 2017.

65.    High-level Water Department employees sent, received, or forwarded the following e-mails:

- An e-mail in which a City employee observed that he was traveling through cities in North Carolina and Tennessee that did not have "negroes" and "taco benders."  The Water Department employee replied, "God love you, you have found paradise you lucky mutha."[12]

- An e-mail that suggested "people should have thrown grenades at a black Italian politician instead of bananas."[13]

- An e-mail in which one Water Department employee observed that he had jury duty, to which another employee replied, "Lynchem!"[14]

- An e-mail that joked about bidding on President Barack Obama at a slave auction.[15]

66.    Abreu saw the following racially-offensive photo displayed in a prominent location in Hansen's office -- on the counter behind his desk, where it was visible to anyone entering his office, including high-ranking Water Department officials.  The photo was framed and captioned "Good day hunting":

---

[12] City of Chicago Office of Inspector General, *Quarterly Report: First Quarter 2018*, at 11 (April 2018).

[13] City of Chicago Office of Inspector General, *Quarterly Report: Second Quarter 2017*, at 9 (July 2017).

[14] City of Chicago Office of Inspector General, *Quarterly Report: First Quarter 2018*, at 11 (April 2018).

[15] City of Chicago Office of Inspector General, *Quarterly Report: First Quarter 2018*, at 12 (April 2018).



67. In the photo, two Chicago police officers "are armed with rifles and kneel over an unidentified African-American drug suspect," who is "lying on his stomach with deer antlers on his head" and "splayed to look like hunters' bounty."[16] The Police Board fired the officers, and a Cook County judge upheld the decision, describing the photo as "horribly offensive."[17]

**E. Abreu lost premium pay opportunities because of race discrimination, which is consistent with the Water Department's policy, custom, and/or practice of denying such opportunities to Hispanic and African-American employees.**

68. In the North District, the Superintendent decides which bricklayers are assigned overtime opportunities. Most bricklayers are offered at least one or two overtime opportunities per pay period. An overtime opportunity typically lasts eight hours and pays one and one-half times a bricklayer's regular rate (and twice the regular rate, if on Sunday or the seventh day of a work week).

---

[16] Aamer Madhani, *Disgraced Chicago Cops Posed with Black Suspect Wearing Antlers*, USA Today, May 27, 2015, at https://www.usatoday.com/story/news/2015/05/27/chicago-police-pose-over-suspect-wearing-antlers/28026851/.

[17] Steve Schmadeke, *Judge Upholds Firing of Chicago Cop over Controversial Photo*, Chi. Tribune, June 10, 2015, at http://www.chicagotribune.com/news/local/breaking/ct-chicago-police-antlers-photo-met-20150610-story.html.

69. When Hansen first started as a Superintendent in the North District, Abreu's overtime hours dropped substantially and, in the years that followed, he did not receive any overtime from Hansen -- despite Abreu's requests, and even though bricklayers with only five or six months of experience received overtime.

70. Any overtime Abreu received while Hansen was Superintendent was ordered during emergency situations and thus outside of Hansen's control (*e.g.*, river overflow, snow detail, and other emergencies).

71. On one occasion, a white bricklayer did not want an overtime opportunity and said to Hansen, "Give it to Abreu." Hansen gave it to a white bricklayer instead. Other bricklayers told Abreu, "It's a shame Hansen doesn't give you overtime." A common refrain in the North District was, "If you're working with Abreu, you won't get overtime."

72. Abreu's crew, which is entirely African American and Hispanic, is assigned to projects that rarely receive overtime, such as catch basins and valve basins, while crews predominantly staffed by white employees are assigned to projects that frequently receive overtime, such as main sewers and private drains.

73. Even after Hansen resigned, Abreu's supervisors have continued to deny or reduce his overtime and other premium pay because of his race and national origin.

74. Consistent with Abreu's experience, the Water Department has a policy, custom, and/or practice of discriminating on the basis of race and national origin against Hispanic and African-American employees with respect to overtime.

75. At a hearing of the City Council Committee on Human Relations on January 10, 2018, numerous Water Department employees testified about this policy, custom, and/or practice.

76. In a written statement to the Committee, the Commissioner of the Water Department tacitly acknowledged this policy, custom, and/or practice, telling the Committee that he had launched an "Overtime Management Initiative" that would "create an overtime management process to streamline the approval of overtime…and distribute overtime more equitably."

77. Additionally, under a previous Superintendent, Jimmy McKenna, Abreu regularly worked as "acting foreman," a position that includes premium pay. By contrast, Hansen never gave Abreu the opportunity to work as acting foreman, instead giving such opportunities to white bricklayers with less seniority.

78. In June 2017, the month after Hansen's termination, Abreu worked as acting foreman for the first time in many years.

79. However, Abreu has since been denied opportunities to work as acting foreman. In February 2019, Abreu was denied a three-month rotation as acting foreman, even though it was his turn under North District procedures for assigning the position.

## F. The Water Department retaliated against Abreu for filing his charge of discrimination with the EEOC.

80. After Abreu filed his charge of discrimination with the EEOC in June 2017, the City conducted interviews about Abreu's charge. Word spread that Abreu had filed an EEOC charge, including among supervisors in the Water Department.

81. Since Abreu filed his EEOC charge, the Water Department has engaged in a pattern of retaliation against him. In the past two years, the Water Department has disciplined Abreu without justification, repeatedly denied him overtime and other premium pay, and withheld equipment necessary to perform his job. The retaliation began shortly after Abreu filed his charge and continues to this day.

     ***i.***     ***The Water Department disciplined Plaintiff***
                ***in retaliation for his protected activity.***

82.    A month after Abreu filed his charge of discrimination with the EEOC, the Water Department suspended him for three days without justification.

83.    On June 1, 2017, Abreu had been working at a job site on the border of Chicago and Evanston. Around 2:00 p.m., Abreu ran out of bricks.

84.    That day's shift ended at 3:30 p.m., and Abreu's crew was required to return to the yard by 3:00 p.m. Given the late hour, distance of the job site from the yard, and heavy traffic (the school day also ended around this time), a driver could not make a round trip between the yard and the job site to deliver more bricks before Abreu's crew needed to return to the yard.

85.    To avoid paying overtime, the typical practice in these circumstances is for the crew to pick up materials when departing from the yard the following morning (every day starts and ends at the yard), rather than call a driver from the yard near the end of a shift.

86.    Plaintiff followed the typical practice of the Water Department. Rather than call for additional bricks just before the end of his shift -- and cause the City to pay overtime to the driver -- Abreu returned to his vehicle and began completing paperwork.

87.    While in his car, Abreu was approached by an Assistant Commissioner (AC), who lived a block away from the site.

88.    The AC expressed disagreement with Abreu's decision and called for more materials himself. The driver arrived at the site just before Abreu's crew needed to return to the yard. Abreu's crew barely had enough time to unload the bricks from the truck, let alone draw water from a hydrant for mixing cement, mix cement (which takes 20-25 minutes), and lay bricks.

89.     In the weeks following this incident, the AC did not discipline Abreu or take any further action relating to this incident.

90.     Plaintiff filed his charge of discrimination on June 30, 2017.  In late July, the City interviewed the AC about Abreu's charge.  On information and belief, the AC expressed anger about being involved in the matter.

91.     On August 1, 2017 -- two months after the alleged incident, but just days after the interview -- the AC suspended plaintiff for three days without pay.

92.     The AC did not decide to discipline Abreu until after Abreu had filed a charge of discrimination.  The discipline was retaliation for Plaintiff's protected activity.

93.     Abreu appealed the discipline.  The adjudicator found that the discipline was unjustified and returned two days of pay in December 2017.

ii.     ***Hansen's successor, Mike Dwyer, yelled at Abreu and denied him overtime in retaliation for his protected activity; Dwyer later resigned for using an ethnic slur.***

94.     The Water Department's "winter program" is a program to address weather-related emergency situations during colder months, such as broken water mains and frozen pipes. Because of the emergency nature of the work, bricklayers work significant overtime.

95.     In January 2018, multiple bricklayers approached Hansen's successor, Mike Dwyer, about giving overtime to Abreu because they were exhausted from working 12-16 hours a day, seven days a week.  After Abreu heard this, he asked Dwyer whether he could work overtime through the "winter program."  In response, Dwyer berated Abreu, yelling that he would shut the winter program down before giving Abreu overtime.

96.    Feeling afraid of Dwyer's anger and aggression, Abreu tried to leave the situation, but Dwyer followed Abreu down the hall and continued to scream and point in Abreu's face. Dwyer yelled that Abreu would never get overtime and should just retire.

97.    The next day, in a meeting with four North District supervisors -- an Assistant District Superintendent and three foremen -- Dwyer apologized for his behavior, but never assigned Abreu overtime hours through the winter program.

98.    Three months after this incident, Dwyer was investigated for using an ethnic slur and "resigned to avoid being fired."[18]

99.    Dwyer worked as Assistant District Superintendent under Paul Hansen and was friendly with Hansen.

100.   Dwyer retaliated against Abreu because of his charge of discrimination, which is focused on Hansen's conduct.

### iii.    *Dwyer denied Abreu necessary equipment in retaliation for his protected activity.*

101.   Dwyer also denied Abreu use of the "vactor machine," a piece of equipment that removes sewage from outlet pipes, catch basins, and main sewers. The vactor machine is necessary to perform his job.

102.   Before filing a charge of discrimination, Abreu had never had a request to use the vactor denied.

103.   After Abreu filed his charge of discrimination, Dwyer denied Abreu use of the vactor 15-20 times.

---

[18] 04.06.2018, Fran Spielman, *More Evidence of Hate-filled Culture: Another Water Management Honcho Resigns*, Chi. Sun Times, at https://chicago.suntimes.com/politics/more-evidence-of-hate-filled-culture-another-water-management-honcho-resigns/.

104.  In the first week of January 2018, Abreu spoke with Dwyer about not being able to get a vactor.  Dwyer responded that Abreu should "dig it out by hand," meaning the sewage.

### iv. The Water Department denied Abreu "acting foreman" opportunities in retaliation for his protected activity.

105.  In the North District, the "acting foreman" position is assigned using a list of full-time bricklayers.  The bricklayers are listed in order of seniority.

106.  An acting foreman assignment lasts for three months.  When the three-month period is complete, the position rotates to the next bricklayer on the list.

107.  Bricklayers receive premium pay for serving as acting foreman.

108.  Under North District procedures for assigning the acting foreman position, Abreu's three-month rotation should have begun in February 2019.  Abreu was denied his rotation without justification.

### G. Consistent with Abreu's experience, the Water Department has a policy, custom, and/or practice of retaliating against employees who complain about racial discrimination.

109.  The Water Department has a policy, custom, and/or practice of retaliating against employees who complain about or otherwise oppose race and national origin discrimination.

110.  Employees who complain about or otherwise oppose race and national origin discrimination are threatened, harassed, and punished through the disciplinary process.

111.  Photographs taken between 2006 and 2016 "show the ways that outspoken employees and employees of color are intimidated."[19]

112.  In one instance, "Judas" was written on the calendar of an employee who complained about discrimination:

---

[19] Kelly Tarrant, *Systemic Racism, Misconduct in Chicago's Water Department Worse than Previously Reported*, Project Six, Aug. 3, 2018, at https://thesecretsix.com/investigation/systemic-racism-misconduct-in-chicagos-water-department-worse-than-previously-reported/.



113. In other instances, "makeshift crosses" were placed "in front of the lockers of African-American employees who filed complaints or spoke up."[20]

114. Although numerous high-ranking employees have been terminated for fostering a racist culture in the Water Department, employees continue to suffer retaliation for complaining about discrimination.

115. At a hearing of the City Council Committee on Human Relations on January 10, 2018, numerous witnesses testified that the Water Department retaliates against employees who complain about racial harassment and discrimination, including by initiating false disciplinary actions and denying overtime pay:

- Edward Mosley, an 11-year employee of the Water Department, testified, "As soon as you complain, you get disciplined. That's just the bottom line. That's how they play the game."

- Mosley also testified, "I was labelled as a whistle-blower, and from that day up until just recently, I have never, not once, been able to get … the overtime that's being handed out like candies at a factory…."

---

[20] Kelly Tarrant, *Systemic Racism, Misconduct in Chicago's Water Department Worse than Previously Reported*, Project Six, Aug. 3, 2018, at https://thesecretsix.com/investigation/systemic-racism-misconduct-in-chicagos-water-department-worse-than-previously-reported/.

- John Moore, a 24-year employee of the Water Department, testified, "I complained to the City of Chicago's EEO office and the Inspector General's Office and the Water Department Human Rights, I was given a 29-day suspension based on a lie…."

- Derrick Edmond, a 33-year employee of the Water Department testified, "There should be hundred, hundreds of us here. Do you know why it's not? Fear of retaliation. And retaliation is going on right now for sure, at the South Water Purification Plant."

- Patrick McDonough, a 20-year employee of the Water Department, testified, "Most of the folks giving discipline were racists.… They were used to keep a person down, and they were used to keep snitches in their place. Many of the workers went to the Illinois Department of Human Rights. All those complaints were covered up. We later filed complaints with the Office of the Executive Inspector General and found Illinois workers falsifying the results of these complaints."

- Frank Coconate, a 28-year employee of the Water Department, testified, "My problem started when I started to be fair with the African Americans, or as this administration called them, 'niggers.'… I wouldn't go along so now I was targeted."

116. The Water Department did not send any witnesses to testify at the hearing. The Commissioner submitted a document titled "Overview of Department of Water Management Steps to Create Cultural Change," which ran just a single page.

117. Following the hearing, the chair of the Committee, Alderman Pat Dowell, acknowledged that discrimination and retaliation continues, and said that the new Commissioner, Randy Conner, would need to "get down into the bowels" of the Water Department to change its racist culture.[21]

118. Five days later, "Mayor Rahm Emanuel acknowledged there are still racial problems in Chicago's Department of Water Management." Mayor Emanuel asserted that

---

[21] Fran Spielman, *Water Management Workers Insist Racist Culture Outlined in Emails Hasn't Changed*, Chi. Sun Times, Jan. 11, 2018, at https://chicago.suntimes.com/chicago-news/water-management-workers-claim-racist-culture-outlined-in-emails-hasnt-changed.

"[y]ou can't judge [Commissioner Conner's] success in six months," because "the culture of that department has been around for decades."[22]

**H.    Abreu has exhausted his Title VII administrative remedies.**

119.    Abreu filed his charge of discrimination with the EEOC on June 30, 2017.

120.    The Department of Justice issued a right-to-sue letter on December 4, 2018.  (*See* Ex. A.)  The right-to-sue letter was sent by certified mail with tracking number 7003 0500 0002 5072 0315.  (*See id.* (upper-left corner of right-to-sue letter noting tracking number).)

121.    The right-to-sue letter from the Department of Justice was delivered to and received by undersigned counsel on January 2, 2019.  (*See* Ex. B.)

**COUNT I**
**Title VII, 42 U.S.C. §§ 2000e *et seq.***
**Hostile Work Environment and Discrimination Claim Against the City of Chicago**

122.  Plaintiff incorporates the preceding allegations in this complaint, as though fully set forth herein.

123.  Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended by the Civil Rights Act of 1991, prohibits intentional discrimination against employees based on race and national origin, including harassment that creates a hostile work environment.

124.  For years, plaintiff suffered harassment because of his race and national origin, including harassment by his supervisor.

125.  Plaintiff did not welcome the race and national origin harassment.

126.  Plaintiff has also suffered discrimination and retaliation because of his race and national origin.

---

[22] Craig Dellimore, *Emanuel Defends New Water Commissioner Amid Racist Culture Complaints*, CBS Chicago, Jan. 15, 2018, at https://chicago.cbslocal.com/2018/01/15/emanuel-defends-new-water-commissioner-amid-racist-culture-complaints/.

127. The Water Department intentionally discriminated against plaintiff by denying and/or reducing overtime and other premium pay because of his race and national origin.

128. The harassment, discrimination, and retaliation were sufficiently severe or pervasive that a reasonable person in plaintiff's position would find plaintiff's work environment to be hostile or abusive.

129. At the time the conduct occurred, plaintiff believed that the conduct made his work environment hostile or abusive.

130. The Water Department knew or should have known about the hostile work environment and discrimination and did not take reasonable steps to correct the situation.

131. In creating and perpetuating this hostile work environment and discrimination, the Water Department Commissioner, Deputy Commissioners, Superintendents, and other managerial employees acted within the scope of their employment and in reckless disregard of plaintiff's rights.

132. The Water Department failed to adequately train employees on its equal employment opportunity policy.

133. The Water Department failed to adequately supervise and discipline employees who engaged in race and national origin harassment and discrimination.

134. As a result of this hostile work environment and discrimination, plaintiff has suffered and continues to suffer emotional distress and economic harms, including lost wages.

**COUNT II**
**42 U.S.C. § 1981 via 42 U.S.C. § 1983**
**Hostile Work Environment and Discrimination Claim Against the City of Chicago**

135. Plaintiff incorporates the preceding allegations in this complaint, as though fully set forth herein.

136.  Section 1981 prohibits race discrimination that inhibits the right to make and enforce contracts.   The term "make and enforce contracts" includes the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

137.  Section 1981 prohibits racial harassment of employees that creates a hostile work environment.

138.  For years, plaintiff suffered harassment because of his race, including harassment by his supervisor, a Water Department policymaker.

139.  Plaintiff did not welcome the racial harassment.

140.  Plaintiff has also suffered discrimination and retaliation because of his race.

141.  Hansen intentionally discriminated against plaintiff by denying and/or reducing overtime and other premium pay because of plaintiff's race.

142.  While engaging in this discrimination, Hansen acted under color of state law, within the scope of his employment, and in reckless disregard of plaintiff's rights.

143.  The Water Department continues to discriminate against plaintiff by denying and/or reducing overtime and other premium pay because of plaintiff's race.

144.  The harassment, discrimination, and retaliation were sufficiently severe or pervasive that a reasonable person in plaintiff's position would find plaintiff's work environment to be hostile or abusive.

145.  At the time the conduct occurred, plaintiff believed that the conduct made his work environment hostile or abusive.

146.  In creating and perpetuating this hostile work environment, the Water Department Commissioner, Deputy Commissioners, and Superintendents -- including plaintiff's supervisor --

24

acted under color of state law, within the scope of their employment, and in reckless disregard of plaintiff's rights.

147. Water Department policymakers were personally involved in creating and perpetuating this hostile work environment and discrimination.

148. Water Department policymakers knew about the hostile work environment and discrimination and allowed this conduct to continue.

149. Water Department policymakers either established, approved, or exhibited deliberate indifference to the hostile work environment and discrimination, thereby ratifying this conduct.

150. The hostile work environment and discrimination are sufficiently longstanding, persistent, and widespread as to constitute policies, customs, or practices of the Water Department. In this way, the Water Department maintains policies, customs, or practices that were the moving force driving the violations of plaintiff's rights.

151. The hostile work environment and discrimination were also caused by the Water Department's failure to adequately train employees on its equal employment opportunity policy, as well as the Water Department's failure to adequately supervise and discipline employees who engaged in racial harassment and discrimination.

152. As a result of this hostile work environment and discrimination, plaintiff has suffered and continues to suffer emotional distress and economic harms, including lost wages.

**COUNT III**
**Fourteenth Amendment via 42 U.S.C. § 1983**
**Hostile Work Environment and Discrimination Claim Against the City of Chicago**

153. Plaintiff incorporates the preceding allegations in this complaint, as though fully set forth herein.

25

154. The Fourteenth Amendment's Equal Protection Clause prohibits intentional discrimination based on race and national origin, including racial harassment that creates a hostile work environment.

155. For years, plaintiff suffered harassment because of his race and national origin, including harassment by his supervisor, a Water Department policymaker.

156. Plaintiff did not welcome the race and national origin harassment.

157. Plaintiff has also suffered discrimination and retaliation because of his race and national origin.

158. Hansen intentionally discriminated against plaintiff by denying and/or reducing overtime and other premium pay because of plaintiff's race and national origin.

159. While engaging in this discrimination, Hansen acted under color of state law, within the scope of his employment, and in reckless disregard of plaintiff's rights.

160. The Water Department continues to discriminate against plaintiff by denying and/or reducing overtime and other premium pay because of plaintiff's race and national origin.

161. The harassment, discrimination, and retaliation were sufficiently severe or pervasive that a reasonable person in plaintiff's position would find plaintiff's work environment to be hostile or abusive.

162. At the time the conduct occurred, plaintiff believed that the conduct made his work environment hostile or abusive.

163. In creating and perpetuating this hostile work environment and discrimination, the Water Department Commissioner, Deputy Commissioners, and Superintendents -- including plaintiff's supervisor -- acted under color of state law, within the scope of their employment, and in reckless disregard of plaintiff's rights.

164.  Water Department policymakers were personally involved in creating and perpetuating this hostile work environment and discrimination.

165.  Water Department policymakers knew about the hostile work environment and discrimination and allowed this conduct to continue.

166.  Water Department policymakers either established, approved, or exhibited deliberate indifference to the hostile work environment and discrimination, thereby ratifying this conduct.

167.  The hostile work environment and discrimination are sufficiently longstanding, persistent, and widespread as to constitute policies, customs, or practices of the Water Department.  In this way, the Water Department maintains policies, customs, or practices that were the moving force driving the violations of plaintiff's rights.

168.  The hostile work environment and discrimination were also caused by the Water Department's failure to adequately train employees on its equal employment opportunity policy, as well as the Water Department's failure to adequately supervise and discipline employees who engaged in race and national origin harassment and discrimination.

169.  As a result of this hostile work environment and discrimination, plaintiff has suffered and continues to suffer emotional distress and economic harms, including lost wages.

**COUNT IV**
**Illinois Civil Rights Act of 2003, 740 ILCS 23/1 *et seq.***
**Discrimination Claim Against the City of Chicago**

170.  Plaintiff incorporates the preceding allegations in this complaint, as though fully set forth herein.

171.  The Illinois Civil Rights Act of 2003, 740 ILCS 23/1 *et seq.*, prohibits race and national origin discrimination by units of local government in Illinois.

27

172.  The City of Chicago is a unit of local government in Illinois.

173.  The conduct described above constitutes discrimination that violates the ICRA.

174.  As a result of these violations of the ICRA, plaintiff has suffered and continues to suffer emotional distress and economic harms, including lost wages.

## COUNT V
### Title VII, 42 U.S.C. §§ 2000e *et seq.*
### Retaliation Claim Against the City of Chicago

175.  Plaintiff incorporates the preceding allegations in this complaint, as though fully set forth herein.

176.  Title VII prohibits retaliation against employees who engage in statutorily-protected activity by opposing an unlawful employment practice.

177.  Filing a charge with the EEOC is statutorily-protected activity under Title VII.

178.  After plaintiff filed his EEOC charge, the Water Department retaliated against him.

179.  There is a causal connection between plaintiff's protected activity and the Water Department's retaliation.

180.  As a result of this retaliation, plaintiff has suffered and continues to suffer emotional distress and economic harms, including lost wages.

## COUNT VI
### Illinois Civil Rights Act of 2003, 740 ILCS 23/1 *et seq.*
### Retaliation Claim Against the City of Chicago

181.  Plaintiff incorporates the preceding allegations in this complaint, as though fully set forth herein.

182.  The ICRA prohibits retaliation against employees who engage in statutorily-protected activity by opposing an unlawful employment practice.

183.  Filing a charge with the EEOC is statutorily-protected activity under the ICRA.

184. After plaintiff filed his EEOC charge, the Water Department retaliated against him.

185. There is a causal connection between plaintiff's protected activity and the Water Department's retaliation.

186. As a result of this retaliation, plaintiff has suffered and continues to suffer emotional distress and economic harms, including lost wages.

### COUNT VII
### 42 U.S.C. § 1981 via § 1983
### Retaliation Claim Against the City of Chicago

187. Plaintiff incorporates the preceding allegations in this complaint, as though fully set forth herein.

188. Section 1981 prohibits retaliation against employees who engage in statutorily-protected activity by opposing an unlawful employment practice.

189. Filing a charge with the EEOC is statutorily-protected activity under § 1981.

190. After plaintiff filed his EEOC charge, plaintiff suffered retaliation by Water Department employees acting under color of state law and within the scope of their employment.

191. There is a causal connection between plaintiff's protected activity and the Water Department's retaliation.

192. Retaliation against employees who complain about discrimination and harassment is sufficiently longstanding, persistent, and widespread in the Water Department as to constitute a policy, custom, or practice.

193. In this way, the Water Department maintains a policy, custom, or practice that was the moving forcing driving the violation of plaintiff's rights.

194. Water Department policymakers knew about this retaliation and allowed it to continue.

195.  Water Department policymakers either encouraged, approved, or exhibited deliberate indifference to the retaliation, thereby ratifying it.

196.  The Water Department failed to adequately train employees on its equal employment opportunity policy.

197.  The Water Department failed to adequately supervise and discipline employees who engaged in retaliation.

198.  As a result of this retaliation, plaintiff has suffered and continues to suffer emotional distress and economic harms, including lost wages.

**COUNT VIII**
**First and Fourteenth Amendments of the U.S. Constitution via 42 U.S.C. § 1983**
**Retaliation Claim Against the City of Chicago**

199.  Plaintiff incorporates the preceding allegations in this complaint, as though fully set forth herein.

200.  The First Amendment prohibits retaliation against employees who engage in constitutionally-protected activity by opposing an unconstitutional employment practice.

201.  Filing a charge with the EEOC is constitutionally-protected activity under the First Amendment.

202.  After plaintiff filed his EEOC charge, plaintiff suffered retaliation by Water Department employees acting under color of state law and within the scope of their employment.

203.  There is a causal connection between plaintiff's protected activity and the Water Department's retaliation.

204.  Retaliation against employees who complain about discrimination and harassment is sufficiently longstanding, persistent, and widespread in the Water Department as to constitute a policy, custom, or practice.

30

205.  In this way, the Water Department maintains a policy, custom, or practice that was the moving force driving the violation of plaintiff's rights.

206.  Water Department policymakers knew about this retaliation and allowed it to continue.

207.  Water Department policymakers either encouraged, approved, or exhibited deliberate indifference to the retaliation, thereby ratifying it.

208.  The Water Department failed to adequately train employees on its equal employment opportunity policy.

209.  The Water Department failed to adequately supervise and discipline employees who engaged in retaliation.

210.  As a result of this retaliation, plaintiff has suffered and continues to suffer emotional distress and economic harms, including lost wages.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff requests that this Court:

(a)  declare that the actions of defendant violated Title VII, the Illinois Civil Rights Act, § 1981 via § 1983, and the First and Fourteenth Amendments of the U.S. Constitution via § 1983;

(b)  enjoin defendant from perpetuating a hostile work environment and discriminatory terms and conditions of employment;

(c)  enjoin defendant from retaliating against plaintiff for his protected activity;

(d)  award plaintiff such damages as will fully compensate him for the economic loss, emotional distress, and deprivation of federal rights caused by defendant's hostile work environment, discrimination, and retaliation;

(e)  award plaintiff his costs and reasonable attorneys' fees;

(f)  award plaintiff prejudgment interest; and

(g)  award plaintiff such other relief as the Court deems just.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38 on

all issues so triable.

Respectfully submitted,


/s/ Matthew J. Owens
Matthew J. Owens
One of the Attorneys for Plaintiff


Nancy L. Maldonado
nmaldonado@lawmbg.com
Matthew J. Owens
mowens@lawmbg.com
Miner, Barnhill & Galland, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
312.751.1170



U.S. Department of Justice
Civil Rights Division
NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

CERTIFIED MAIL
7003 0500 0002 5072 0315

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4701*
*Washington, DC 20530*

December 04, 2018

Mr. Dilan Abreu
c/o Nancy L. Maldonado, Esquire
Law Offices of Miner, Barnhill & Galland
325 N. LaSalle Street
Suite 350
Chicago, IL  60654

Re: EEOC Charge Against City of Chicago
    No. 440201704652

Dear Mr. Abreu:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC Chicago District Office, Chicago, IL.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Eric S. Dreiband
Assistant Attorney General
Civil Rights Division

by *Karen L. Ferguson*

Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: Chicago District Office, EEOC
    City of Chicago

Exh. A



U.S. Department of Justice
Civil Rights Division
NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

CERTIFIED MAIL
7003 0500 0002 5072 0315

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4701*
*Washington, DC 20530*

December 04, 2018

Mr. Dilan Abreu
c/o Nancy L. Maldonado, Esquire
Law Offices of Miner, Barnhill & Galland
325 N. LaSalle Street
Suite 350
Chicago, IL 60654

Re: EEOC Charge Against City of Chicago
    No. 440201805394

Dear Mr. Abreu:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC Chicago District Office, Chicago, IL.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Eric S. Dreiband
Assistant Attorney General
Civil Rights Division

by *Karen L. Ferguson*
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: Chicago District Office, EEOC
    City of Chicago

# USPS Tracking®

**FAQs** ❯ **(https://www.usps.com/faqs/uspstracking-faqs.htm)**

## Track Another Package  ✚

**Tracking Number:** 70030500000250720315                    Remove ✕

Your item was delivered to the front desk, reception area, or mail room at 1:40 pm on January 2, 2019 in CHICAGO, IL 60654.

## ⊘ Delivered

January 2, 2019 at 1:40 pm
Delivered, Front Desk/Reception/Mail Room
CHICAGO, IL 60654

Feedback

---

**Tracking History**                                                    ⌃

**January 2, 2019, 1:40 pm**
Delivered, Front Desk/Reception/Mail Room
CHICAGO, IL 60654
Your item was delivered to the front desk, reception area, or mail room at 1:40 pm on January 2, 2019 in
CHICAGO, IL 60654.

**December 31, 2018, 12:36 pm**
Delivery Attempted - No Access to Delivery Location
CHICAGO, IL 60654

**December 19, 2018, 4:28 pm**
Arrived at Unit
CHICAGO, IL 60610

**December 15, 2018, 10:03 am**
Out for Delivery
CHICAGO, IL 60654

Exh. B

**December 15, 2018, 9:53 am**
Sorting Complete
CHICAGO, IL 60654

**December 14, 2018, 12:07 am**
Departed USPS Regional Facility
CHICAGO IL DISTRIBUTION CENTER

**December 13, 2018**
In Transit to Next Facility

**December 13, 2018, 11:20 am**
Arrived at USPS Regional Facility
CHICAGO IL DISTRIBUTION CENTER

**December 11, 2018, 12:51 am**
Arrived at USPS Regional Facility
GAITHERSBURG MD DISTRIBUTION CENTER

Feedback

---

## Product Information ∧

**Postal Product:**

**Features:**
Certified Mail™

---

### See Less ∧

# Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

### FAQs (https://www.usps.com/faqs/uspstracking-faqs.htm)

**The easiest tracking number is the one you don't have to know.**

With Informed Delivery®, you never have to type in another tracking number. Sign up to:

- See images* of incoming mail.

- Automatically track the packages you're expecting.

- Set up email and text alerts so you don't need to enter tracking numbers.

- Enter USPS Delivery Instructions™ for your mail carrier.

**Sign Up**

**(https://reg.usps.com/entreg/RegistrationAction_input?**

*NOTE: Black and white (grayscale) images show the outside, front of letter-sized envelopes and mailpieces that are processed through USPS automated equipment.**app=UspsTools&appURL=https%3A%2F%2Ftools.usps.com%2Fgo**

Feedback