IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DILAN ABREU, | ) | |
| | ) | |
| Plaintiff, | ) | No. 19-cv-2161 |
| | ) | |
| v. | ) | The Honorable Rebecca R. Pallmeyer |
| | ) | |
| CITY OF CHICAGO, | ) | Magistrate Judge Sunil R. Harjani |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL
PRODUCTION OF DOCUMENTS AND TO DETERMINE SUFFICIENCY OF
DEFENDANT'S ANSWERS TO REQUESTS FOR ADMISSION**

Nancy L. Maldonado
nmaldonado@lawmbg.com
Matthew J. Owens
mowens@lawmbg.com
Miner, Barnhill & Galland, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
312.751.1170

In his ten-count complaint, Abreu alleges that, for years, a powerful Superintendent in the City's Water Department, Paul Hansen, harassed him with slurs like "spic," "dumb Puerto Rican," and "Spanish-speaking nigger," and denied him overtime because of his race and national origin. When the abuse turned physical in the fall of 2016, Abreu reported Hansen to the City, but the City did nothing in the many months that followed. The year following Abreu's internal complaint, the Inspector General found (as part of a separate investigation of Hansen and other senior-level officers, up to the Commissioner of the Water Department) that Hispanic and African-American employees across the Water Department had suffered an "unrestricted culture of overtly racist and sexist behavior and attitudes," encouraged at the highest levels and left unchecked by the City for decades. This racist culture, and the widespread harassment and discrimination it caused, is the basis for Abreu's *Monell* claims.

The City's initial discovery responses were seriously deficient, and Abreu has met and conferred with the City for months, with a view towards narrowing the number of disputes requiring the Court's intervention. Two categories of disputes remain. First, the City seeks to drastically limit the scope—temporally and otherwise—of discovery into: emails and other communications with racial content, such as slurs, jokes, and stereotypes; complaints and investigations related to race and national origin discrimination, harassment, and retaliation; policies, procedures, and trainings (or lack thereof) for preventing such misconduct; and payroll data necessary to prove discrimination in assigning overtime. Second, the City asserts that it need not admit or deny whether former Mayor Emanuel and members of the City Council made damning statements about the Water Department's racist culture in the wake of the Inspector General's investigation. The Court should order the City to produce these relevant documents and answer the requests for admission properly.

**I.      The City's initial discovery responses were seriously deficient; Abreu has met and conferred with the City extensively, with a view towards narrowing the number of disputes requiring the Court's intervention.**

Abreu has worked diligently towards securing needed discovery, including electronically-stored information ("ESI"), since June 2019. Per the Seventh Circuit's electronic discovery protocol, Abreu first requested a meet and confer to discuss electronic discovery in June 2019, which was delayed until September 10 due to the transition in mayoral administrations. *See* Ex. A, ¶ 2.

Abreu served interrogatories, requests for production of documents, and requests for admission in early August. The City made its first production two months later, on October 14, after considerable negotiation around the City's numerous proposed modifications to this Court's Model Confidentiality Order, which was entered on October 4. *See* Ex. A, ¶ 3. The parties explored settlement in October and November. After these discussions reached impasse, discovery recommenced in earnest: Abreu outlined the serious deficiencies of the City's discovery responses in a 14-page letter, *see* Ex. H, and the parties then met and conferred extensively over two months, *see* Ex. A, ¶¶ 4-9. During this period, the Court held four status hearings and advised the City to reconsider a number of its objections. *See* Exs. I-L. Between the Court's urging—and, in one instance, order—and the substantial meet and confer process, the City has tacitly acknowledged that many of its objections were not substantially justified, conceding or withdrawing some of these objections, and supplementing (or agreeing to supplement) a number of others. *See* Ex. M.

On January 16, Abreu requested a final meet and confer on all outstanding discovery issues. The City responded on January 23 with a 15-page letter that stated its final positions, and the parties held final meet and confers on January 28 and 29.

**II.     Rule 26(b)(1) grants "expansive power" to discover information relevant to any claim or defense, and Abreu's *Monell* claims demand broad and substantial discovery.**

Under Federal Rule of Civil Procedure 26(b)(1), parties are granted "expansive power to discover information 'regarding any nonprivileged matter that is relevant to any party's claim or defense.'" *Harris Davis Rebar, LLC v. Structural Iron Workers Local Union No. 1, Pension Tr. Fund*, No. 17 C 6473, 2019 WL 447622, at *3 (N.D. Ill. Feb. 5, 2019). "[R]elevance is to be construed broadly," and "[i]f relevance is in doubt, courts should err on the side of permissive discovery." *Doe v. Loyola Univ. Chi.*, No. 18 CV 7335, 2020 WL 406771, at *2 (N.D. Ill. Jan. 24, 2020). "If discovery appears relevant, the burden is on the party objecting to a discovery request to establish the request is improper." *Id.* The Court weighs whether the request is "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "[T]here is a strong public policy in favor of disclosure of relevant materials." *Doe*, 2012 WL 6568242, at *5. Moreover, with respect to *Monell* claims specifically, "[d]istrict courts…have routinely recognized that such claims often require a broad and substantial amount of discovery that would not be involved if the plaintiff sued only the individuals directly involved in the deprivation of his rights." *Awalt v. Marketti*, No. 11 C 6142, 2012 WL 6568242, at *3 (N.D. Ill. Dec. 17, 2012).

**III.    This case addresses issues of critical importance to Abreu and the many Hispanic and African-American employees that have worked in the Water Department.**

The issues at stake in this litigation—a racist culture left unchecked by the City for decades, as Abreu and other Hispanic and African-American employees in the Water Department were subjected to harassment, discrimination, and retaliation—are of paramount importance and weigh heavily in favor of expansive discovery. In the wake of a May 2017 Inspector General report that condemned the Water Department for "an unrestricted culture of overtly racist and sexist behavior

3

and attitudes," City officials promised sweeping reform. But the City now denies the conclusion of that very same report. *See* Answer ¶¶ 4, 45 (admitting that the Inspector General published the report, but denying the conclusion of the report). Open discovery is thus of critical importance for Abreu and for other Hispanic and African-American employees who have suffered harassment, discrimination, and retaliation in the Water Department. Indeed, open discovery is important for any resident of the City who believes that government agencies should operate without "an unrestricted culture of overtly racist and sexist behavior and attitudes."

Shortly after the Inspector General released its May 2017 report—to widespread news coverage—the City's Corporation Counsel promised "to conduct an 'independent, third-party review,'" which would include "recommendations to prevent and address discrimination in the workplace," and reforms that would ensure that "not only are employees and supervisors aware of the [equal employment opportunity] policy, but that complaints are reported and investigated in a timely manner."[1] The audit was completed in July 2017 and, based on the privilege log entry, appears to have amounted to a four-page letter. Ex. N, at 2. That same month, the Department of Human Resources closed its investigation into Abreu's complaint. Based on discovery produced by the City, it appears that no investigation was performed beyond an initial interview with Abreu.

In January 2018, the City Council Committee on Human Relations held a hearing on a resolution to "root out racist, discriminatory and otherwise hostile practices in [the Water Department]." Ex. O. Nearly two dozen current and former Water Department employees testified. First Am. Compl. ¶ 47. Following the hearing, Alderman David Moore stated that the Committee was "horrified to hear about the continued culture of overt bigotry in the Water Department" and

---

[1] *See* Fran Spielman & Sam Charles, *Changes in Water Department Announced; Offensive Emails Released*, CHI. SUN TIMES (June 3, 2017), at https://chicago.suntimes.com/2017/6/3/18400387/changes-in-water-department-announced-offensive-emails-released.

"deeply troubled that not one representative from the administration appeared to testify about what is being done to address the problem." Ex. P, at 1.

Alderman Sophia King called for "an outside and independent audit to analyze … overtime and other areas fraught with discrimination based on race and gender." Ex. P, at 2. No audit was ever conducted. The discrimination in overtime assignments that Abreu experienced mirrors the testimony from this hearing, and Abreu seeks discovery of payroll data relevant to these claims.

Despite new leadership and promises of reform, Abreu has repeatedly suffered retaliation and ostracization. First Am. Compl. ¶¶ 89-121. Abreu's experience echoes that of other employees who have come forward—including as recently as August 2019, when an African-American engineer resigned, stating that "the culture at the Water Department has not changed."[2]

### IV. The City's temporal scope and other scope objections as to emails, policies and procedures, trainings, organizational charts, payroll data, and complaints are unfounded.

#### A. Abreu has proposed a reasonable temporal scope for his discovery requests.

Most of Abreu's requests for production set a temporal scope of December 1, 2010 to either the date of a custodian's discharge—for emails and other communications—or the present. Ex. B, at 8. This temporal scope accounts for the time that Abreu suffered discrimination and harassment by Hansen, who became Superintendent of the North District in December 2010. Abreu's request for payroll data of bricklayers and laborers in the North District extends a bit further, to January 1, 2008, to permit comparative statistical analysis of overtime and other premium pay compensation before and after Hansen became Superintendent. Ex. B (Reqs. for Produc. Nos. 30 & 32).

The City initially asserted that discovery should only extend to the beginning of the limitations period, which it argued was 2015, and stood on this objection after Abreu provided case

---

[2] Craig Wall, *Discrimination Complaints Lead to Calls for Chicago's Water Commissioner to be Fired*, ABC NEWS (August 1, 2019), at https://abc7chicago.com/5436010/.

law to support his longer temporal scope.[3] *See* Ex. H, at 6. At a status hearing on December 5, the Court advised the City that it would likely overrule the temporal scope objection—and explained why the objection was unfounded. *See* Ex. I, at 6-7.

The City has since agreed to search Hansen's emails from December 1, 2010 to the date of his discharge in May 2017, a period of about six years. It has also offered to produce payroll data from January 1, 2009 to present—but only for Abreu's crew and a sample crew, a total of 6-8 employees. For all other requests, the City asserts that discovery should only extend to 2014, but does not cite any case law to support this assertion. Ex. M, at 4.

The Court should overrule the City's objections. Abreu's requested temporal scope is not only grounded in well-established law, it is conservative—there is strong legal support for extending discovery to 2005—and the City has failed to make a persuasive showing of burden.

1. Discovery should extend to December 1, 2010 for emails (and other communications), policies and procedures, trainings, organizational charts, and <u>complaints of race and national origin discrimination, harassment, and retaliation</u>.

Abreu alleges that Hansen subjected him to discrimination from December 2010, until Hansen's last day in office. *See* First Am. Compl. ¶¶ 2, 5, 76. In hostile work environment and discrimination cases, courts typically permit discovery to extend four to five years *before* the alleged violations occurred, which would be 2005 in this case. *See Perry v. Ill. Cent. R.R. Co.*, No. 14 CV 756, 2014 WL 10742632, at *3-4 (N.D. Ill. Nov. 6, 2014) (four years); *Leibforth v. Belvidere Nat. Bank*, No. 99 C 50381, 2001 WL 649596, at *2 (N.D. Ill. June 8, 2001) (five years). Thus, extending discovery to December 1, 2010 is not only grounded in law—it is conservative.

Importantly, unlike most cases, where the likelihood of uncovering additional evidence of discrimination is unknown, here there is every reason to believe that discovery from December 1,

---

[3] As discussed in response to the City's motion to dismiss, the City incorrectly asserts that the statute of limitations for the § 1981 claims is two years, when in fact the statute of limitations is four years. *See* Pl.'s Resp. to Def.'s Mot. to Dismiss at 11-12. But the Court need not resolve this issue to decide this motion.

2010 to 2014 will produce large amounts of relevant evidence. *See Leibforth*, 2001 WL 649596, at *2 (signaling that discovery for a period of five years before the discriminatory act "may then be broadened [to ten years] upon a showing by plaintiffs that extending the time period would likely produce further evidence of discrimination"). Former Mayor Emanuel and members of City Council acknowledged that the Water Department's racist culture had existed for decades. *See, e.g.*, First Am. Comp. ¶ 57 (Mayor Emanuel acknowledging that the racist culture "has been around for decades" and persisted even after numerous senior-level employees had resigned); *id.* ¶ 56 (Alderman Sawyer acknowledging that the Water Department's "pervasive culture of racism" has been "an open secret for years"). These statements are corroborated by contemporaneous evidence, such as a September 2011 complaint to the Inspector General that called for "a full investigation why for over a decade Paul Hansen gets away with calling people niggers, spics, etc." Ex. Q.

Additionally, the Inspector General's investigation, which searched emails from 2012 to 2016, found numerous emails sent or received in 2012 and 2013 that included offensive content about race and national origin. *See* Ex. S. Of particular note are emails exchanged between Hansen and Thomas Powers, the Commissioner of the Water Department preceding Barrett Murphy. In a June 2013 email, for example, Hansen and Powers engaged in an extended conversation in mock "ebonics," and Hansen made racially-offensive statements about his African-American supervisor. Ex. S, at 13. Similarly, in a January 2014 email (within the City's proposed discovery cutoff, but just barely) Powers asked about a plumber in the North District, and Hansen responded, "he oly [*sic*] plays with african american midget hookers!" Ex. T, at 6. These earlier emails—at least one of which is outside the City's proposed temporal scope—shed new light on later offensive email exchanges between Hansen and Powers. *See* Ex. T, at 7. And they are also highly relevant to the *Monell* claims, as they establish that the racist culture did not begin with Commissioner Murphy, but had been entrenched for years, passing from Commissioner to Commissioner.

7

Finally, to prove his *Monell* claims, Abreu must establish that a policy or practice caused his injury. Municipalities rarely state their unlawful policies expressly, so in most cases—including the present case—plaintiffs must prove that a policy existed by showing a series of similar violations over an extended period time. Given the practical realities of proving *Monell* claims, courts have recognized that a longer temporal scope is necessary. *See, e.g.*, *Grayson v. City of Aurora*, No. 13 C 1705, 2013 WL 6697769, at *5 (N.D. Ill. Dec. 19, 2013) (Kendall, J.) (holding that 12 years of discovery was "not overly broad" and was necessary "to show whether [the plaintiff's] allegations are sufficiently widespread to satisfy the *Monell* standard").

For these reasons, the Court should order the City to produce the following documents from December 1, 2010 to the present (or, in the alternative, to the date of the custodian's discharge):

1. **Emails and other communications (such as text messages)**. Requests for Production Nos. 6, 10 & 26 request emails and other communications related to the claims in this case, such as emails and communications that have content related to race and national origin (*e.g.*, jokes, stereotypes, and slurs), and communications that mention Abreu and other Puerto Rican employees.

2. **Complaints**. Request for Production No. 18 requests complaints of race and national origin discrimination, race and national origin harassment, and retaliation of any kind involving employees in the Water Department. The City has offered to produce complaints against Hansen from 2010 to present, and complaints against six other employees from 2014 to present. Ex. M, at 4.

3. **Policies and procedures**. Request for Production No. 11 requests Water Department rules, policies, procedures, and guidelines related to equal employment opportunity, discrimination, harassment, and retaliation; personnel and human resources; and compensation, including assignment of overtime, acting foreman positions, and other opportunities for premium pay. With the exception of one set of personnel rules, no other policies or procedures produced by the City date back to 2010. To the extent that the City has other responsive documents for this time period, they should be produced.

4. **Trainings**. Request for Production No. 12 requests trainings provided to Water Department employees on equal employment opportunity, harassment, discrimination, and retaliation, including but not limited to presentations (*e.g.*, PowerPoint presentations), handouts, and records of attendance. The City has only produced trainings from 2017 to 2019. The Court should order the City to produce trainings from December 1, 2010 to 2016 or, if no such trainings exist, order the City to admit Request for Admission No. 35, which states that

"[b]efore June 2017, the Water Department did not require annual equal employment opportunity (EEO) training for all employees."[4]

5. **Organizational charts**. Requests for Production Nos. 13 and 14 request organizational charts of the Water Department, including organizational charts that identify the employees occupying different positions. The City has only produced organizational charts from 2014 to the present.

6. **Investigations**. Request for Production No. 24 requests documents concerning investigations by the City related to race and national origin harassment and discrimination, and retaliation of any kind in the Water Department, and it lists the numbers of eight Inspector General investigations. The City has produced documents from Inspector General investigations initiated in 2014 through 2017. To the extent other 2010-2014 investigations exist—be they Inspector General investigations, Department of Human Resources investigations, or other City agency investigations—they should be produced.

2. Discovery should extend to January 1, 2008 for payroll data, and include *all* bricklayers and laborers in the Water Department's North District.

Abreu alleges that when Hansen first became Superintendent in the North District in December 2010, his overtime hours dropped substantially and, in the years that followed, he did not receive any overtime from Hansen. First Am. Compl. ¶ 76. He also asserts that the City had a policy or practice of discriminating against Hispanic or African-American bricklayers (and the laborers who worked on their crews) with respect to overtime. First Am. Compl. ¶ 83. Accordingly, Abreu requests payroll data for two years before Hansen became Superintendent (*i.e.*, to January 1, 2008) through the present, as such data is necessary to perform a comparative statistical analysis of compensation before and during Hansen's tenure. *See* Ex. B (Req. for Produc. Nos. 30 & 32). Here, too, Abreu's proposed time period is conservative, yet the City has only agreed to produce data from 2009 to present for a very limited number of workers (two crews, or 6-8 employees in total).

The Court should order the City to produce payroll data for 2008 in addition to 2009, and for *all* bricklayer crews in the North District, a total of 14-15 crews of 3-4 people. "Going way back to

---

[4] A document the Water Department provided to City Council states that, after being appointed in June 2017, Commissioner Conner ordered an EEO training for all employees, and that the training is "now a condition of ongoing employment at [the Water Department] and all staff will go through it annually." Ex. R. Although the City concedes that this document is authentic, it claims that it "lacks knowledge sufficient to admit or deny whether at any time prior to 2017 the Water Department required annual equal employment opportunity training for all employees." Ex. E, at 11.

9

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973), the Supreme Court explained that an employee might be able to show that an employer's proffered reason for decision might be pretextual by relying on…statistics as to [the employer's] employment policy and practice…." *Young v. City of Harvey & Denard Eaves*, No. 15 C 11596, 2016 WL 4158952, at *3 (N.D. Ill. Aug. 4, 2016) (Chang, J.). Abreu is thus "entitled to discovery of information from which [he] can derive a statistical analysis of [the City's] employment practices," because such evidence "can be probative as to the issue of whether disparate treatment is the result of discrimination." *Leibforth*, 2001 WL 649596, at *1 (citing *Bell v. E.P.A.*, 232 F.3d 546, 552 (7th Cir. 2000)). A single year of pre-Hansen data from a small sample is insufficient for a robust comparative statistical analysis, and the City has not explained why producing an additional year of data for a narrow pool of workers—just bricklayers and laborers (out of the many trades in the Water Department), and just one district (out of three)—would be unduly burdensome. To the contrary: it is Abreu's understanding, based on statements from the City official responsible for producing the data, that the 2008 data could be included in the City's production by making a small change to the algorithm for exporting the data.

### B. The City should comply with Request for Production No. 18 in full and produce all complaints of race and national origin discrimination, harassment, and retaliation involving employees in the Water Department.

In addition its temporal scope objection, the City argues that Request for Production No. 18—which seeks race and national origin discrimination, harassment, and retaliation complaints of Water Department employees—is irrelevant and unduly burdensome. Ex. M, at 11.

The City's relevance argument is unpersuasive. As this Court has recognized, "a plaintiff may establish a widespread practice" under *Monell* "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned…the misconduct of subordinate officers." *Pindak v. Dart*, 125 F. Supp. 3d 720, 756 (N.D. Ill. 2015) (Pallmeyer, J.); *see also, e.g.*, *Awalt*, 2012 WL 6568242, at *3-5. And even in cases without *Monell*

10

claims, courts often permit broad discovery into employee complaints, as such evidence is relevant to pretext. *See, e.g.*, *Perry*, 2014 WL 10742632, at *3; *Davis v. Precoat Metals.*, No. 01 C 5689, 2002 WL 1759828, at *2 (N.D. Ill. July 29, 2002).

The City also argues that gathering the complaints would be unduly burdensome because the complaints are not stored in a single location and cannot be searched by type, Ex. M, and because the Water Department has a total of 2,000 employees, Ex. F, at 9. In lieu of responding to Abreu's request, the City states that it will search for complaints filed with the Department of Human Resources against just seven employees. Ex. M, at 4.

Judge Kendall rejected a similar set of arguments in *Awalt v. Marketti*, where a plaintiff alleging inadequate medical care by a jail requested all relevant complaints for a five-year period, and the defendant argued undue burden because the jail maintained 15,000 inmate files, two different medical companies maintained another 1,000 files, and all of the files were organized alphabetically (not by subject matter) and in paper form. 2012 WL 6568242, at *1-2, *7. Granting the motion to compel, Judge Kendall observed that "[d]ue to the fact that *Monell* claims implicate a potentially large number of events taking place in an organization over a period of time, they naturally, and necessarily require extensive and often burdensome discovery," but "these are not *undue* burdens." *Id.* at *7. Discovery should not "leave the requesting party at the mercy of how comfortably its claims align with the producing party's document filing system" *Id.* *5.

The Court should order the City to comply with Request for Production No. 18 in full and produce all complaints of race and national origin discrimination, harassment, and retaliation involving employees in the Water Department, from December 1, 2010 to present.

### C. The Court should order the City to perform reasonable searches of emails and other communications (*e.g.* text messages) with content related to race and national origin.

The City initially objected to producing emails and other communications (*e.g.*, text messages) with race and national origin content other than references to Hispanics and Puerto

11

Ricans. In early December, the City withdrew this objection. Since that time, the parties have engaged in a lengthy meet and confer process over custodians and search terms for email searches.

With regard to custodians for email searches, the City has proposed seven: Hansen, Commissioner Barrett Murphy, William Bresnahan, and four other employees within Abreu's chain of command. *See* Ex. M, at 4. In addition to these seven employees, Abreu has proposed adding the following three categories of individuals as custodians (numbering 25 in total): (1) all employees who were the subject of the Inspector General's investigation into the Water Department's racist culture, except for a chemist who did not communicate with Hansen; (2) any employee who sent or received an email with offensive content based on race or national origin that was identified in these Inspector General investigations; and (3) all Commissioners and Deputy Commissioners. *See* Ex. U. There is substantial overlap between these three categories: many employees who were the subject of the Inspector General's investigation sent or received emails with offensive race and national origin content. But at least ten employees who received such emails were not investigated by the Inspector General. *See* Ex. U; *see also, e.g.*, Ex. S, at 5, 11, 19 & 48; Ex. T, at 1, 6-7 & 22.

With regard to search terms for email searches, the parties have met and conferred extensively on 23 searches—the majority of which are based on offensive terms known to be used by Water Department employees—which could be performed across multiple custodians simultaneously.[5] *See* Ex. V. At the status hearing on January 30, the parties reported that they were close to agreement, but that the City's counsel "needed a little more time" and would "finalize agreement on [the search terms] by [Wednesday, February 5]." Ex. L, at 3 (1.30.2020 Hr'g Tr.). The City did not respond to follow-up emails from Plaintiff's counsel on January 30, February 4 and February 6. *See* Ex. W & X. On Friday, February 7 at 11:45 a.m.—hours before this filing was

---

[5] After the City produced materials from the Inspector General investigations, it agreed to perform additional searches in lieu of producing all of the emails identified in those investigations. The four searches added at the end of Exhibit V reflect this agreement.

due—Plaintiff's counsel received the following email from Defendant's counsel: "[W]e are following up on the additional proposed custodians and search terms with our client and should have an answer to you by the end of the day." Ex. W. Plaintiff's counsel informed Defendant's counsel that close of business on the day of filing would be unacceptable, but that he could wait until 2:00 p.m. *Id.* At the time of filing, Plaintiff's counsel has not received any word from the City.

The Court should order the City to conduct a search of emails using the search terms to which the parties have tentatively agreed, for the full list of custodians identified in Ex. U. The Court should also order the City to perform a reasonable search of text messages and any other communications that may include content related to race and national origin.[6]

### V. The City should perform a reasonable inquiry and admit or deny statements made by former Mayor Emanuel and members of City Council.

Abreu served requests for admission related to statements by members of City Council and former Mayor Rahm Emanuel in news articles about the racist culture of the Water Department. Rather than admit or deny these statements, the City asserts that it "lacks sufficient knowledge to admit or deny" whether these officials made the statements. *See* Ex. E (Def.'s First Supp. Resp. to Pl.'s Reqs. for Admis. Nos. 28, 31, 32, 36, 37, 38, 39, 40, 42, 43 & 44). However, the City has not stated that it made a "reasonable inquiry" before asserting lack of knowledge, as required by Federal Rule of Civil Procedure 36(a)(4).

"Reasonable inquiry includes investigation and inquiry of any of defendant's officers, administrators, agents, employees, servants, enlisted or other personnel, who conceivably, but in realistic terms, may have information which may lead to or furnish the necessary and appropriate

---

[6] At a meet and confer on January 30, 20, Plaintiff's counsel proposed a reasonable search of text messages, which would begin with a search of just Hansen's text messages, and then expand if relevant text messages were found. Plaintiff's counsel memorialized this proposal in an email that same day, Ex. X, and followed up on the proposal on February 4, 2020, Ex. W. On February 7, 2020—the deadline for this filing—the City responded as follows: "We have not agreed to search text messages. We agreed to investigate this request to determine the burden, which we are in the process of doing. We also discussed a potential limited search of Hansen's texts, but that wholly depends on whether they are accessible." Ex. W.

13

response." *Taborn v. Unknown Officers*, No. 00 C 652, 2001 WL 138908, at *1 (N.D. Ill. Feb. 16, 2001). Under certain circumstances, a party may also be required to "consult third parties." *Brown v. Overhead Door Corp.*, No. 06 C 50107, 2008 WL 4614299, at *2 (N.D. Ill. Oct. 16, 2008). Here, former Mayor Emanuel and members of City Council are officers of the City. *See* 65 ILCS 5/6-3-3 (defining mayor and aldermen as "municipal officers"). The City was thus required to conduct a reasonable inquiry by asking these individuals whether the quoted statements were accurate. Doing so would have been simple, because the City represents former Mayor Emanuel in this case, and it has indicated to the Court and Plaintiff's counsel that it may also represent the Aldermen.[7]

The City asserts, without any case support, that it was not required to make a reasonable inquiry because the Mayor and Aldermen are "elected officers" rather than "appointed officers." Ex. M, at 7. Abreu is not aware of any case law that makes this distinction—and it is not a distinction that makes sense. All City officers, "whether elected or appointed," take the same oath of office, *see* 65 ILCS 5/6-4-9; an elected officer is no less an "officer" than an appointed one, and the City has access to both elected and appointed officers to make a reasonable inquiry.

The City also argues that asserting lack of knowledge was proper because the statements were outside of these officers' duties. Ex. M, at 7. Not true. The Mayor's statements were made in the context of discharging senior-level Water Department officials, appointing a new Commissioner, and promising reform of the Water Department's racist culture to comply with employment laws and policies. *See* 65 ILCS 5/6-4-7 (the Mayor is charged with "exercis[ing] control of all departments and divisions thereof," appointing and removing "heads of all departments" and "all other officers of the municipality," and "enforc[ing] the laws and ordinances within the municipality"). And the Aldermen made their respective statements with respect to a

---

[7] Plaintiff's counsel has repeatedly asked the City whether it represents these Aldermen, and has raised this issue in multiple status hearings, *see* Ex. J, at 15-16 (12.23.2019 Hr'g Tr.); Ex. K, at 11-17 (1.8.2020 Hr'g Tr.). On February 7, 2020—the deadline for filing the motion to compel—the City informed Abreu that it is "still determining our representation of the aldermen identified in the requests for admission." Ex. W.

14

legislative oversight hearing on a City Council resolution, which was within their legislative duties. *See Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010) (quoting *United States v. Brewster*, 408 U.S. 501, 512 (1972)) ("A legislative act has consistently been defined as an act generally done [by the legislative body] in relation to the business before it.").

For these reasons, the Court should order the City to perform a reasonable inquiry and either admit or deny Requests for Admission Nos. 28, 31, 32, 36, 37, 38, 39, 40, 42, 43 and 44.

## CONCLUSION

Abreu respectfully requests that the Court grant this motion to compel documents and determine the sufficiency of requests for admission. In the event that Abreu prevails, he also requests that the Court award reasonable expenses incurred in briefing the motion, including attorney's fees. *See* Fed. R. Civ. P. 37(a)(5)(A). "The great operative principle of [Rule 37(a)(5)] is that the loser pays," unless he or she "establish[es] that [the] position was substantially justified." *Rickels v. City of S. Bend*, 33 F.3d 785, 786-87 (7th Cir. 1994). A fee award is appropriate as the City has been on notice that at least two of its objections—temporal scope and claiming "lack of sufficient knowledge" to answer certain requests for admission—are *not* substantially justified and would likely be overruled. *See* Ex. I, at 6-7 (12/05/19 Hr'g Tr.); Ex. J, at 15-16 (12/23/19 Hr'g Tr.). Looking forward, a fee award could help the parties evaluate the costs of litigation—and the costs of pursuing certain litigation strategies. *See Rickels*, 33 F.3d at 787 ("Fee shifting when the judge must rule on discovery disputes encourages their voluntary resolution and curtails the ability of litigants to use legal processes to heap detriments on adversaries (or third parties) without regard to the merits of the claims.").

Respectfully submitted,

/s/ Matthew J. Owens
Matthew J. Owens
One of the Attorneys for Plaintiff

15

Nancy L. Maldonado
nmaldonado@lawmbg.com
Matthew J. Owens
mowens@lawmbg.com
Miner, Barnhill & Galland, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
312.751.1170