**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DILAN ABREU,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19 C 2161** |
| **v.** | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **CITY OF CHICAGO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Dilan Abreu works in the City of Chicago's Department of Water Management. Abreu alleges that his supervisor, Paul Hansen, harassed him on the bases of his race and national origin between 2015 and 2017. Abreu also alleges that after he complained about Hansen's harassment, several people in the Department retaliated against him. In March 2019, Abreu sued the City, asserting claims of hostile work environment and unlawful retaliation in violation of several state and federal civil rights statutes and the U.S. Constitution. The City now moves for summary judgment on eight of Abreu's nine claims.[1] For the reasons discussed below, the City's motion [148] is granted as to Abreu's retaliation claims and otherwise denied.

## BACKGROUND

Plaintiff Dilan Abreu has worked as a sewer bricklayer for the City of Chicago's Department of Water Management ("DWM") since 2000. (Def.'s Statement of Material Facts (hereinafter "DSOF") [151] ¶ 1; Pl.'s Statement of Additional Material Facts (hereinafter "PSOAF") [176] ¶ 1.) Abreu identifies as Hispanic and Puerto Rican. (PSOAF ¶ 1.) Abreu alleges that for approximately two years, from 2015 to 2017, he was harassed by his white supervisor, former DWM Superintendent Paul Hansen. (*Id.*; Pl.'s Resp. to Def.'s Statement of Material Facts

---

[1] The City also seeks to limit the scope of the remaining claim—hostile work environment under Title VII of the Civil Rights Act—based on an argument about the applicable statute of limitations.

(hereinafter "PSOFR") [167] ¶ 1.)  After he complained about the harassment, Abreu alleges, several City employees retaliated against him.  (DSOF ¶ 1.)  Invoking federal civil rights laws, parallel state laws, and the U.S. Constitution, Abreu alleges nine total counts: hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") (Counts I and VI); hostile work environment and retaliation in violation of the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.* ("IHRA") (Counts II and VII); hostile work environment and retaliation in violation of 42 U.S.C. § 1981 (brought via 42 U.S.C. § 1983) (Counts III and IX); hostile work environment and retaliation in violation of the Illinois Civil Rights Act of 2003, 740 ILCS 23/1 *et seq.* ("ICRA") (Counts V and VIII); and hostile work environment in violation of the Fourteenth Amendment of the U.S. Constitution (brought via 42 U.S.C. § 1983) (Count IV).  (*See* Second Am. Compl. (hereinafter "SAC") [132].)

I.      **The City's Department of Water Management and Department of Human Resources**

The City employs more than 33,000 individuals, including more than 2,000 in the DWM. (DSOF ¶ 3.)  The DWM is divided into six bureaus, one of which is the Bureau of Operations and Distribution ("BOD"), which BOD employs about 1,000 individuals.  (*Id.* ¶ 7; Quinn Dep., Ex. 3 to DSOF (hereinafter "Quinn Dep.") [151-3] at 70:3-19.)  The BOD is divided into three divisions: Systems Maintenance, Repair and Maintenance, and New Construction.  (DSOF ¶ 6.)  And the Systems Maintenance Division is divided further into three districts: North, Central, and South. (*Id.* ¶ 6.)

Abreu works as a sewer bricklayer in the North District of the Systems Maintenance Division of the BOD.  (*Id.* ¶ 1.)  Bricklayers are supervised by foremen, who report to one of several Assistant District Superintendents, who in turn report to the District Superintendent.  (*Id.* ¶¶ 8-9.)  Hansen was the Superintendent of the North District between 2015 and his resignation in 2017.  (*Id.* ¶ 1.)  District Superintendent duties include (1) directing and managing the day-to-day water and sewer work operations at the district level, (2) managing and supervising Assistant District Superintendents, (3) monitoring and evaluating work performance of subordinate staff, (4)

initiating and enforcing disciplinary actions as required, (5) enforcing the City's Personnel Rules, and (6) performing related duties as required.  (*Id.* ¶ 10.)

As District Superintendent, Hansen reported to the Deputy Commissioner of Operations and Distribution, the highest-ranking BOD employee.  (*See Id.* ¶ 5.)  Over the relevant time period, that position was filled by Dwayne Hightower, who is African American.  (*See* PSOAF ¶ 42.) Hightower reported to one of two Managing Deputy Commissioners, each of whom reported to the First Deputy Commissioner, who in turn reported to the Commissioner—the highest-ranking employee at the DWM.  (DWM Organizational Chart, Sealed Ex. 4 to DSOF [152-1]; DSOF ¶ 5.)

The City also has a Department of Human Resources ("DHR"), which includes an Equal Employment Opportunity ("EEO") Division.  (DSOF ¶ 11.)  The EEO Division enforces the DHR's equal employment policies, and the Deputy Commissioner of the EEO Division, its head, reports directly to the DHR Commissioner.  (*Id.* ¶ 11-12.)  Several investigators and officers work in the Division and report to the EEO Division Deputy Commissioner.  (*Id.* ¶ 12.)

## II.     The City's Equal Employment Policies and Practices

During the relevant time period, two EEO policies governed City workers—one issued in 2013 and then, beginning in 2019, an updated version of the policy.  (*Id.* ¶ 13.)  Under both versions, the City prohibits harassment and discrimination based on race or national origin, and also prohibits retaliation against a person (1) opposing discriminatory practices, (2) complaining about conduct prohibited by the policy, or (3) complaining to, cooperating with, or assisting the EEO Division or a City department in resolving a complaint of discrimination.  (*Id.* ¶ 14; *see* 2013 EEO Policy, Ex. 10 to DSOF (hereinafter "2013 EEO Policy") [151-7] at 1-2; 2019 EEO Policy, Ex. 11 to DSOF (hereinafter "2019 EEO Policy") [151-8] at 1-2.)  Supervisors have a duty to report violations of the EEO policy to their Department's EEO liaison, or else to an EEO officer or EEO deputy.  (PSOAF ¶ 21.)  EEO liaisons work with different City departments and refer complaints to the EEO Division of the DHR.  (Def.'s Pando Fed. R. Civ. P. 30(b)(6) Dep., Ex. 9 to DSOF [151-6] at 42:6-19.)  The City also has written Personnel Rules, implemented in 2010 and 2014, which

similarly prohibit discrimination and harassment based on race and national origin, as well as retaliation for engaging in protected activity. (DSOF ¶ 16.)

### A.    EEO Employee Trainings

The EEO Policy requires EEO officers to "[c]onduct training to ensure that all employees and volunteers are aware of this Policy and that all Department Heads, Departmental Liaisons and Supervisors understand their role in implementing this Policy and promoting a fair and inclusive workplace." (*See* 2013 EEO Policy at 3; 2019 EEO Policy at 4.) On March 7, 2013, Soo Choi, the DHR Commissioner at the time, sent a memorandum to all department heads stating that DHR "will be providing copies of the new policy for your Human Resources liaisons to distribute to all employees." (Mar. 7, 2013 Mem., Sealed Ex. 20 to DSOF (hereinafter "March 7, 2013 Mem.") [152-10] at 1.) Choi also stated that "employees will need to sign a form acknowledging that they received it." (*Id.*) Both Abreu and Hansen signed these forms in March 2013. (DSOF ¶ 21.) Choi further noted in the memorandum that the policy will be "posted on the City's Internet and Intranet sites" and that DHR "will be offering training covering the new Policy for all HR liaisons and EEO Liaisons." (Mar. 7, 2013 Mem.)

DWM's Commissioner has the authority to require all employees to attend EEO training annually. (PSOAF ¶ 25.) But prior to 2017, this training was not made mandatory. (Def.'s Hernandez-Tomlin FED. R. CIV. P. 30(b)(6) Dep., Ex. 12 to DSOF (hereinafter "Def.'s Hernandez-Tomlin 30(b)(6) Dep.") [151-12] at 67:23-69:21; PSOAF ¶ 28.) On October 7, 2014, Judith Marrs, the Deputy Commissioner of DHR, emailed departmental EEO liaisons—including Maureen Egan, DWM's liaison—and noted that "[a]lthough DHR has not made [EEO training for supervisors] mandatory, there are several reasons that each supervisory employee should receive this training." (Oct. 7, 2014 Email from Judith Marrs, Ex. 19 to PSOAF [170-20] at 1.) One such reason, Marrs stated, is that DHR "ha[s] learned from past training sessions that supervisors are sometimes unaware of the extent of their obligations in this area, and the importance of responding appropriately to employee concerns related to harassment and

discrimination."[2]  (*Id.* at 2.)  Marrs recommended that "[a]nyone who holds a supervisory role should attend, regardless of title."  (*Id.*)  Later that day, Egan forwarded the email to Thomas Powers (the DWM Commissioner between 2011 and 2016), Barrett Murphy (the First Deputy Commissioner from July 2011 to May 2016 and then the DWM Commissioner from May 2016 to June 2017), and Managing Deputy Commissioner Julie Hernandez-Tomlin, with the following note:

> Good grief.  There does not seem to be much of a plan in place for cycling every supervisor through this training.
>
> Let me know how you want to handle this.  Maybe send a few of us in Admin in November and then see if they come up with a better plan for training every supervisor?

(Oct. 7, 2014 Email from Maureen Egan, Ex. 19 to PSOAF (hereinafter "Egan Email") [170-20] at 1; PSOAF ¶ 6.)[3]  When asked whether the DHR ever came up with a better plan for these trainings, Defendant's Federal Rule of Civil Procedure 30(b)(6) designee testified: "I don't believe so."  (Pl.'s Apr. 16, 2021 Hernandez-Tomlin FED. R. CIV. P. 30(b)(6) Dep., Ex. 20 to PSOAF (hereinafter "Pl.'s Apr. 16, 2021 Hernandez-Tomlin 30(b)(6) Dep.") [170-21] at 182:18-21.)

For the period from January 1, 2010, through April 30, 2017, the City has no record of Hansen, Abreu, or any DWM Commissioner, Managing Deputy Commissioner, Deputy Commissioner, or Assistant Commissioner having received training on the policy.  (PSOAF ¶ 28.) And in that timeframe, of the 2000+ DWM employees, only 15 received such training, three of them in DWM's BOD, and just one—Assistant District Superintendent Andrew Bonaparte—in the North District of DWM's BOD, where Abreu worked.  (PSOAF ¶ 29.)

---

[2]  Defendant argues that this statement is inadmissible hearsay.  The court allows the statement not to prove the matter asserted (that supervisors were unaware of their obligations) but rather for the purpose of showing that, at the time of this email, the DHR recognized the necessity of training DWM supervisors.  *See* FED. R. EVID. 803(3).

[3]  Defendant objects to this email as hearsay.  The court allows the statement for the purpose of showing that DWM's EEO liaison perceived a need for a more specific plan for training supervisors.

Murphy, the Commissioner during part of the time when Hansen harassed Abreu, testified that he "wish[ed] [the City] had mandatory—better EEO training across the board," and he "wish[ed] [he] had done more at the Water Department" in particular.  (Murphy Dep., Ex. 6 to PSOAF (hereinafter "Murphy Dep.") [170-7] at 145:1-7.)  He also acknowledged in his testimony that training DWM employees might have prevented Hansen's harassment of Abreu.  (*Id.* at 144:8-25.)  In June 2017—after Hansen's resignation—the DWM did implement a policy of mandatory annual EEO training for all DWM employees.  (PSOAF ¶ 31; Def.'s Hernandez-Tomlin 30(b)(6) Dep. at 65:18-66:7.)

### B.    EEO Investigation Policies and Practices

In 2012, the City implemented written protocols for use by EEO investigators in the event of an EEO complaint.  (DSOF ¶ 17.)  A complaint could reach the EEO division in one of six ways: (1) by referral from the EEO liaison or other department personnel, (2) from the hotline number, (3) by email to an investigator or other EEO official, (4) by referral from the Chicago Office of Inspector General, (5) by referral from the Mayor's Office, or (6) through an in-person filing. (DSOF ¶ 18.)  Defendant's 30(b)(6) designee testified that if an employee is being harassed by their own supervisor, the City either has "a conversation with [the supervisor to let them know] that they're being investigated and [that] they . . . need to follow . . . the rules and policies in place," or else the City prioritizes the employee's complaint to resolve it "quicker . . . than normal." (Pl.'s Pando FED. R. CIV. P. 30(b)(6) Dep., Ex. 8 to PSOAF (hereinafter "Pl.'s Pando 30(b)(6) Dep.") [170-9] at 176:8-177:1.)

Where the EEO Division sustains an EEO complaint involving a DWM employee, the Division makes a recommendation of discipline to the DWM Commissioner.  (PSOAF ¶ 22; Def.'s Resp. to PSOAF (hereinafter "DSOFR") [186] ¶ 22.)  The DWM Commissioner has discretion to follow the recommendation, take some other action, or take no action.  (PSOAF ¶ 22.)  The EEO Division has no recourse for appealing the decision of the DWM Commissioner.  (*Id.*)  Nor can the City Council overturn such a decision; Defendant's 30(b)(6) designee testified that the City

Council is limited to holding a hearing and questioning the Commissioner about his or her decision.  (*Id.*; Pl.'s Pando 30(b)(6) Dep. at 173:17-174:3.)

During the time of the alleged harassment in this case, the EEO Division was understaffed. Defendant's 30(b)(6) designee testified that, due to understaffing in 2016, there were cases put on hold "regardless if [the EEO Division] believed they were going to be sustained or unsustained." (Pl.'s Pando 30(b)(6) Dep. at 147:22-148:14.)  The designee further acknowledged that it is important for the City to staff the EEO Division adequately in order to put a prompt end to occurrences of discrimination and harassment and to "put everybody on notice that, hey, this policy is being enforced and you shouldn't engage in that behavior."  (*Id.* at 155:19-157:2; PSOAF ¶ 10.)  Alderman David Moore, who served on the City Council's Budget Committee in 2016, testified that he believes the City could have increased its budget for EEO investigations.[4]  (Moore Dep., Ex. 12 to PSOAF (hereinafter "Moore Dep.") [170-13] at 229:19-230:10.)

The City's EEO Policy states that "[e]ach Department head must take necessary steps to implement this Policy within his or her department[,] including designating a Departmental EEO Liaison and making efforts to ensure that the liaison fulfills the duties established in this policy." (2013 EEO Policy at 3; 2019 EEO Policy at 4; *see* PSOAF ¶ 14.)  Those duties include promptly reporting complaints of discrimination or retaliation to an EEO officer and assisting with EEO investigations.  (2013 EEO Policy at 3-4; 2019 EEO Policy at 4.)  But EEO liaisons do not receive any training specific to performing their responsibilities as a liaison.  (PSOAF ¶ 14.)  The City has no record that DWM's EEO liaison from 2014 to 2016, Maureen Egan, received training on the EEO policy.  (PSOAF ¶ 15.)  Defendant's 30(b)(6) designee testified that, prior to 2020, the EEO Division had never issued EEO liaison guidelines.  (Pl.'s Pando 30(b)(6) Dep. at 44:6-45:9.)

---

[4] Defendant objects that this statement is inadmissible because "Alderman David Moore lacked personal knowledge to make the assertion that . . . the City could have increased its budget to meet the need for EEO investigators."  (DSOFR ¶ 13.)  Given that Alderman Moore was a member of the budget committee, and his testimony here pertains only to his personal understanding of the City's budgetary constraints, Defendant's objection is overruled.

DWM investigations were not always kept confidential. Abreu testified that, though he did not know how, Hansen "would find out" whenever people complained about him. (Abreu Dep., Ex. 3 to PSOAF (hereinafter "Abreu Dep.") [170-4] at 122:8-11; PSOAF ¶ 95.) Abreu did not explain how he came to believe that Hansen would find out about complaints. But Deputy Commissioner Hightower offered some confirmation of that belief; he testified that employees feared retaliation for reporting Hansen "[b]ecause they knew he had a close relationship with senior management, excluding [himself]." (Hightower Dep., Ex. 24 to PSOAF [170-25] at 189:1-18.)

Plaintiff also points to a 2017 letter that Randy Conner, the Commissioner at the time, sent to the Inspector General. The letter relates to a July 25, 2017, OIG investigative report about the conduct of Luci Anderson, a Deputy Commissioner of DWM. (PSOAF ¶ 62.) As discussed in more detail below, this report was one of several that were sent by the OIG to the City in relation to its investigation into the conduct of employees at the DWM. The parties do not say what prompted the investigation that led to these reports. Among the findings in the July 2017 report was that Anderson had received many emails containing racist, offensive, and hateful language, and that Anderson "failed to report those emails and, in at least one instance, provided an affirming and acquiescing email response."[5] (OIG Report on Luci Anderson, Ex. 49 to PSOAF [170-50] at 1, 12.) The report also stated that Anderson's silence "likely caused Hansen and other DWM employees to believe that their racist conduct was acceptable or would be permitted to continue without consequence." (*Id.* at 12.) The report concluded with a recommendation of discharge due to Anderson's decision to "turn a blind eye to the obvious racism that she encountered," which "served to perpetuate DWM's racist culture." (*Id.*)

---

[5] Defendant objects to the OIG reports as inadmissible hearsay. (*See, e.g.*, DSOFR ¶ 57.) But Defendant does not explain why the findings in these reports would not fall under the hearsay exception in civil cases for "factual findings from a legally authorized investigation." FED. R. CIV. P. 803(8)(A)(iii). Such findings are "presumed to be admissible," and "[t]he burden to show untrustworthiness lies on the party seeking to exclude" them. *Daniel v. Cook County*, 833 F.3d 728, 740 (7th Cir. 2016). Defendant's objections to the OIG findings are overruled.

Conner stated in his letter that while he "agree[d] with the OIG's determination that Mrs. Anderson violated Personnel Rules," the "circumstances do not warrant termination."[6] (Aug. 24, 2017 Letter from Randy Conner, Ex. 50 to PSOAF [170-51] at 1.)  Defendant's 30(b)(6) designee testified about those circumstances: three top-level officers at DWM, one of which was the Commissioner, were copied on the emails Anderson received.  (Pl.'s Apr. 16, 2021 Hernandez-Tomlin 30(b)(6) Dep. at 90:7-91:3.)  The 30(b)(6) witness, evidently explaining the decision to excuse Anderson's failure to take action, asserted that the fact that other top-level officers also received the emails justified Anderson's "belief . . . that she would be retaliated against or looked at as a whistleblower.  She was afraid to report."  (*Id.* at 92:9-93:2.)  The designee testified that Anderson's fear of retaliation was warranted *despite* the fact that she could have reported to the OIG or DHR confidentially; "[e]ven if [Anderson] went to the Inspector General, they would have conducted interviews," and "[c]hances are good that it would have gotten out."  (*Id.* at 93:20-95:7.)

## III.    Race and National Origin Harassment at DWM

### A.    Sustained Complaints

Defendant claims there were "just *four* sustained internal complaints" of harassment based on race or national origin between 2010 and 2017.  (DSOF ¶ 24.)  As Plaintiff points out, Defendant does not cite evidence sufficient to support that claim.[7]  (*See* PSOFR ¶ 24.)  Defendant relies on responses it made to Plaintiff's Third Set of Requests for Admission, but it is not evident that Plaintiff included in those requests a comprehensive list of employee complaints or discipline.  (*See* Def.'s Resps. to Pl.'s Third Set of Reqs. for Admis., Ex. 25 to DSOF [151-13].)  Defendant also cites several pages of its "Discipline Management System" search results (*see* Discipline

---

[6]    Defendant argues that Conner's statements are hearsay.  (DSOFR ¶ 63.)  The court admits Connor's email simply as evidence that DWM did not terminate Anderson.  The reasons why DWM did not terminate Anderson—which Conner explains in his letter—are also supplied by Defendant's 30(b)(6) designee.

[7]    Plaintiff also points out that, in addition to sustained complaints, there is evidence of many allegations of racially offensive language that were filed with the EEO Division.  (*See* PSOAF ¶¶ 79-81.)

Management System, Sealed Ex. 26 to DSOF [152-13]), but Defendant acknowledges that the system "is not a complaint logging database" and "is not necessarily comprehensive"; in light of those admissions, it is not clear to the court (and the parties do not explain) what purpose the system serves.  (Def.'s Resp. to Nos. 15-22 of Pl.'s Second Req. for Admis., Ex. 28 to PSOAF [170-29] ¶¶ 17, 19.)  It is also not clear from the record whether any "complaint logging database" other than this one exists, but the court assumes it does not; Defendant has admitted that to "unequivocally" determine every time an employee was disciplined for harassment, "the City would need to review personnel records for every employee in the North District for a seven-year period"—a review the City apparently did not undertake in this matter.  (*Id.* ¶ 19.)

Similarly, Defendant claims there were "*zero* sustained complaints of retaliation against DWM employees for complaining about racial or national origin harassment."  (DSOF ¶ 24.)  Again, that statement is potentially overbroad; the record supports a finding that there were zero such sustained complaints among the cases noted by Plaintiff in his requests for admission.

### B.    Evidence of Hansen's Racial Harassment

#### 1.    Abreu's Testimony and Allegations in His EEO Complaint

On or about October 6, 2016, Abreu contacted the City's EEO Division by phone to complain about Hansen.  (DSOF ¶ 28.)  In an interview with the EEO Office on November 2, 2016, Abreu detailed several specific complaints, which staff at the EEO Office entered into a report.  (*Id.*)  According to that report, Abreu alleged that beginning in mid-2015, Hansen began calling Abreu a "spic" or "stupid fuckin spic," not directly to Abreu's face, but while Hansen was walking away after speaking with Abreu.  (*Id.* ¶ 29; Abreu EEO Compl., Ex. 29 to DSOF (hereinafter "Abreu EEO Compl.") [152-14] at 2.)  Abreu alleged that he heard this epithet directed toward him "at least 10 times," but had not heard it directed toward any other employee.  (Abreu EEO Compl. at 2-3.)  Abreu also alleged that Hansen would call him a "dumb Puerto Rican," an "idiot," a "dumb fuck," and say Puerto Ricans are "the dumbest people there is"—that last phrase "about a dozen times."  (*Id.* at 3-4.)

Abreu supports and expands upon these allegations in his testimony. He testified that Hansen "used . . . the N word a lot . . . right in front of [him]." (Abreu Dep. at 30:8-17.) For example, Abreu heard Hansen say to Bonaparte, "you're the dumbest N[-word] ADS" (Assistant Deputy Superintendent).[8] (*Id.* at 121:2-4.) Abreu said Hansen would call Abreu "a [n*****] with an accent," "a dumb Puerto Rican," "a spic," and a "pork chop." (*Id.* at 26:21-27:16, 30:21-22.) He said Hansen would use this language "almost every time" he was in Hansen's presence. (*Id.* at 31:7-22.)

The incident that ultimately precipitated Abreu's complaint about Hansen to the EEO Division occurred in September 2016. (PSOAF ¶ 94.) Abreu alleged that Hansen and Deputy Commissioner Hightower showed up at Abreu's work site, and Hansen stated (the parties do not explain to whom this statement was directed) that he "wanted [Abreu] suspended" for not working at the correct job site on a prior occasion. (Abreu EEO Compl. at 4-5.) This was not true, Abreu asserted. He alleged that after he told Hansen that he had in fact worked at the correct job site, Hansen "got mad, took his vest off, [and] threw it into his car." (*Id.* at 5.) Then, while Abreu was standing beside a six-foot hole in the ground at the construction site where Abreu's team was working, and while Abreu stood with his back to Hansen, Abreu's coworkers "yelled at [him] to watch out" because "[Hansen was] coming after [him]." (*Id.*) Abreu alleged he "saw Paul [Hansen] coming straight at [him] with [his] helmet in his hand," and Abreu "leaped out of the way, and [Hansen] almost fell in the hole." (*Id.*) Abreu claimed Hansen "would have pushed [him] into the hole if [he] had not moved."[9] (*Id.*)

Bonaparte, who was also at the job site that day, testified in support of Abreu's account. First, in relation to Hansen's accusation that Abreu was working at the wrong site, Bonaparte

---

[8] Bonaparte confirmed this incident in his testimony. (Pl.'s Bonaparte Dep., Ex. 4 to PSOAF [170-5] at 145:3-146:9.)

[9] Abreu reiterated these same facts in his deposition testimony. (*See* Abreu Dep. at 139:19-24, 140:15-22.)

testified that he had directed Abreu not to work at the job site Hansen had in mind. (Pl.'s Bonaparte Dep., Ex. 4 to PSOAF [170-5] at 139:22-25, 140:10-12.) And with respect to the near altercation between Hansen and Abreu, Bonaparte observed that Hansen was "furious" and "irate" that day and was yelling and screaming. (*Id.* at 140:20-141:19.) Bonaparte testified that it did appear to him, from his vantage point, about 50 feet away, that Hansen intended to "bump [Abreu] with his shoulder" to make Abreu fall into the hole, but that someone alerted Abreu in time for him to move out of the way. (*Id.* at 152:22-153:23.)

Hansen does not credibly cast doubt on Abreu's allegations. At first, Hansen testified that he "d[id] not recall" any of the alleged incidents of harassment, but at the end of his deposition Hansen admitted he had repeatedly lied under oath. (Hansen Dep., Ex. 5 to PSOAF [170-6] at 100:11-110:8, 274:8-279:22.) For example, after Plaintiff's counsel asked whether Hansen had been "lying under oath" when he testified that he "did not know what the term 'Negro' means," Hansen responded, "I assume I was, yes." (*Id.* at 277:4-8; *see id.* at 278:1-2 ("I guess I was—I was lying under oath.").)

### 2. Testimony of Commissioner Murphy

Murphy confirmed Abreu's claims that Hansen frequently used racially offensive language. (Murphy Dep. at 73:17-22.) Murphy became aware of such language years before Abreu's complaints, at some point between 2007 and 2009. (*Id.* at 137:7-22.) Murphy recalled that Hansen would come into Murphy's office "screaming and yelling" and referring to employees with "a racial or ethnic epit[het]." (*Id.* at 118:4-24.) Murphy also heard Hansen use the term "spic" and use "stereotypes for Hispanics." (*Id.* at 77:2-10, 101:2-20.) Because Murphy's office was not near Hansen's, he did not frequently observe Hansen interacting with subordinates in person, but (on an unspecified date) when Murphy was on the phone with Hansen, he overheard Hansen say racially offensive things to Dorothy Woodward, an African American employee who shared an office with Hansen. (*Id.* at 138:12-139:17.) Murphy testified that it would not surprise him if Hansen had used the N-word directed at Abreu. (*Id.* at 79:6-22.) Murphy also testified that

Hansen mocked and imitated the speech of African Americans in more than four dozen emails to senior-level DWM officials, often in reference to specific DWM employees.  (PSOAF ¶ 40.)

### 3.    Testimony of Reinaldo Jimenez

Reinaldo Jimenez, an Assistant Deputy Superintendent who reported directly to Hansen between 2014 and 2015, was also of Puerto Rican ethnicity and, like Abreu, experienced racial harassment.  (Jimenez Dep., Ex. 25 to PSOAF (hereinafter "Jimenez Dep.") [170-26] at 58:11-60:23.)  Rather than calling Jimenez by name, Jimenez testified, Hansen would simply yell at him to get his attention.  (*Id.* at 65:10-24.)  Jimenez also said Hansen would call him "Puerto Rican," such as "hey, Puerto Rican, get over here."  (*Id.* at 69:8-71:15.)  Jimenez stated that he believed Hansen had called him "dumb Puerto Rican" on one occasion.  (*Id.* at 83:19-25.)  Jimenez also testified that Hansen mocked and imitated the accents of native Spanish speakers who speak English as a second language.  (PSOAF ¶ 37.)  For example, Jimenez testified that Hansen would say "jard" instead of "yard," "jes" instead of "yes," and "jellow" instead of "yellow."   (Jimenez Dep. at 189:11-191:14; *cf.* May 9, 2013 Email from Hansen to Murphy [170-31] at 9 ("[I] have a jard full of [P]uerto [R]ican [drivers].").)

Jimenez testified that he talked to William Bresnahan—a Managing Deputy Commissioner from around 2010 or 2011 to May 2017—about Hansen's offensive statements.  (Jimenez Dep. at 93:24-94:14; PSOAF ¶ 6.)  In response, Jimenez recalled, Bresnahan simply stated, "that's Paul." (Jimenez Dep. at 93:24-94:14.)  Jimenez also told Murphy about the offensive statements, and Murphy responded by saying something like, "we're working on it."  (*Id.* at 100:22-101:22.) Jimenez came to view further complaints as pointless because he believed nothing was going to change.  (*Id.* at 153:25-154:6.)  Jimenez also testified that he did not know he could submit a complaint about Hansen to the EEO Division.  (PSOAF ¶ 48.)  The City has no record of Jimenez receiving training on the EEO Policy during that time period.  (*Id.*)

### 4. Hansen's Emails

Hansen sent numerous emails to DWM supervisors and colleagues that included racially offensive comments.[10]  (PSOAF ¶ 41.)  On April 5, 2011, Bresnahan forwarded to Hansen an email from Alderman Ray Suarez, who is Hispanic, in which Suarez asked DWM to fix water leaks in his ward.  (April 5, 2011 Emails Between Hansen and Bresnahan, Ex. 30 to PSOAF [170-31] at 6.)  In the forwarded message, Bresnahan referred to Alderman Suarez as "Your buddy Ray." (*Id.*)  Hansen replied: "Six [S]undays from [P]uerto [R]ican new year 2016," an apparent statement that he would not be addressing the water leaks for the next five years.  (*Id.*)

On October 3, 2012, in a response to Murphy about a sewer repair—which the court presumes involved pouring concrete, though it is not clear—Hansen wrote, "pouring today not tomorrow.  [W]e pour in the ghetto on rainy days."  (Oct. 3, 2012 Email from Hansen to Murphy, Ex. 30 to PSOAF [170-31] at 7.)  On April 18, 2012, Barrett Murphy forwarded to Hansen a request from Alderman Suarez to clean certain sewers in his ward that were full of garbage; Hansen replied to Murphy: "He should tell the animals to put their fucking garbage in the trash can."  (April 18, 2012 Email from Hansen to Murphy, Ex. 30 to PSOAF [170-31] at 8.)

On July 27, 2012, Deputy Commissioner Hightower forwarded to Hansen a work request for a crew to come "remove" something that "looks like a chicken hook."  (PSOAF ¶ 38; July 27, 2012 Emails, Ex. 30 to PSOAF (hereinafter "July 27, 2012 Emails") [170-31] at 1.)  The request had come from the office of an Hispanic alderman, Ariel Reboyra.  (PSOAF ¶ 38.)  Hansen replied to Hightower, "what the fuck is a chicken hook," and Hightower responded, "LOL."  (July 27, 2012 Emails at 1.)  Hansen then forwarded this email chain to Bresnahan and Murphy, stating, "any ideas, [I] am not understanding [A]frican [A]merican, [P]uerto [R]ican thinking today."  (*Id.*)

---

[10]  Defendant objects to the introduction of Hansen's emails on the basis that they are inadmissible hearsay.  But it is obvious that Plaintiff would not offer such offensive statements for their truth; these are evidence of the language Hansen used, with apparent impunity, when emailing DWM employees.

In a February 26, 2013, email to Murphy, Hansen described DWM laborers as "severely challenged negro midgets." (Feb. 26, 2013 Email from Hansen to Murphy, Ex. 31 to PSOAF [170-32] at 1.) On July 15, 2013, Hansen sent an email entitled "Chicago Safari Tickets" to Murphy and Bresnahan that invoked racial stereotypes and compared residents of Hispanic and African American neighborhoods in Chicago to wild animals. (PSOAF ¶ 44.) Hansen forwarded the same message to Thomas Durkin, DWM's General Foreman of Plumbers, who replied to Hansen:

> I want to hope the "Safari Vehicles" are "Wild Animal" "Proof" – against spears, bullets with all the action obviously going on. Camouflage might be a good/necessary option for when on foot stalking/observing the wild animals in their elements. Just a thought with the obvious untamed creature and their actions that are the norm with the safari[s] that I have read or heard about. This week will be action packed I'm guessing with the heat wave that is moving in….seems to "stimulate" the creatures of certain area[s] on the safari tour…… awesome program though!

(*Id.*; July 15, 2013 Email from Durkin to Hansen, Ex. 35 to PSOAF [170-36] at 1.)

In an email on January 14, 2014, Hansen sent the first portion of a racially offensive joke directly to Hightower. (Jan. 14, 2014 Emails, Ex. 32 to PSOAF [170-33] at 1-2.) Hansen then forwarded the email to Murphy with the rest of the joke. (*Id.*) On March 13, 2014, Hansen forwarded an email containing a racist joke about a "one-legged [n*****]" to Bresnahan, saying "[t]hey found diddly," which was a nickname (along with "diddy") that Hansen and others used for Hightower. (Mar. 13, 2014 Email from Hansen to Bresnahan, Ex. 32 to PSOAF [170-33] at 3-4; PSOAF ¶ 42.)

On July 25, 2014, Hansen sent an email to Murphy in which he stated: "I HAVE IN MY OFFICE A MILITANT AFRICAN AMERICAN WOMAN WHO WANTS HER FUCKING [WORK SUPPLIES] ORDER APPROVED. SHE IS THREATENING TO HANG ME FROM A TREE NAKED AND THROW FROZEN HALF PEELED BANANAS AT ME." (July 25, 2014 Email from Hansen to Murphy, Ex. 29 to PSOAF [170-30] at 1.) Hansen was referring to Woodward; Murphy testified that he believed she was asking Hansen to approve an order for "a printer or paper or something." (Murphy Dep. at 182:3-183:3.) Murphy acknowledged that the language used by

Hansen evoked racially offensive images, in particular, the comparison of Woodward to "a primate" and the reference to "a lynching." (*Id.* at 183:4-184:9.) In Alderman Moore's view, this email should have prompted Murphy to terminate Hansen immediately. (Moore Dep. at 74:18-75:15, 77:3-8.)

On October 21, 2014, Stanley J. DeCaluwe, DWM Foreman of Water Pipe Construction, requested a cleaning on North Claremont Avenue, and Hansen responded: "That's in the ghetto, we will get [to it] in the spring." (Oct. 21, 2014 Email from Hansen to DeCaluwe, Ex. 30 to PSOAF [170-31] at 2.) On July 1, 2015, DeCaluwe sent an email to Hansen (evidently while Hansen was on vacation) wishing him "a great time where ever [sic]" he was, and Hansen replied, "Fontana North Carolina tonight, last night [D]andridge Tennessee. Google both of them and I guarantee you can't find a negro!" (July 1, 2015 Emails Between Hansen and Decaluwe, Ex. 30 to PSOAF [170-31] at 4.) One minute later, Hansen sent another reply: "Or a taco bender for that matter." (*Id.* at 3.) That same day, Hansen sent a photograph from his vacation to Murphy, and Murphy's return email asked, "is that diddly (i.e., Hightower) I see [in the photo]?"; Hansen responded: "No negros here!" (July 1, 2015 Emails, Ex. 32 to PSOAF [170-33] at 7.) Hansen then followed up with another email: "36 hours south and ain't seen one yet, this is beautiful country." (*Id.* at 9.) Hansen also sent other emails to DWM employees that included references to shooting, lynching, and gutting people of color. (PSOAF ¶ 43.)

In an email that Hansen sent to Murphy, Egan (the EEO liaison), and other officials, Hansen joked that the City's EEO Policy did not apply to him. (PSOAF ¶ 46; Murphy Dep. at 263:2-22.) (The parties have not identified the date of this email or explained what prompted it.) Murphy admitted that Hansen had a pattern of mocking the City's policies, and Murphy testified that Hansen had no reason to fear that he would face any discipline for his actions, and no reason to believe the EEO Policy would be enforced against him. (Murphy Dep. at 264:20-265:2, 274:3-275:3.)

IV.     **OIG Investigations and Reports**

In September 2011, the OIG received a complaint alleging that Hansen "gets away with calling people [n******], spics, etc." and had done so for "over a decade."  (Sept. 27, 2011 Email, Ex. 22 to PSOAF [170-23] at 1; Def.'s Answers to Pl.'s Third Set of Interrogs., Ex. 24 to PSOAF (hereinafter "Def.'s Answers to Interrogs.") [170-24] at 1-2.)   In response to interrogatories, Defendant has admitted that its records "indicate[ ] that no investigation or referral" regarding this complaint was made "due to lack of resources."  (Def.'s Answers to Interrogs. at 3.)  OIG did not refer this complaint to the EEO Division.  (PSOAF ¶ 33.)

Several years later, however, the OIG did conduct an investigation into DWM harassment.  The parties do not specify the date the investigation began or what triggered it.  On July 15, 2017, the OIG issued a public report that stated:

> [A]n OIG investigation found egregious, offensive racist and sexist emails distributed by and among employees of the Department of Water Management (DWM) that extended to senior levels of department management and that suggested the existence of an unrestricted culture of overtly racist and sexist behavior and attitudes within the department.  OIG recommended that DWM discharge multiple employees and refer them to the ineligible[-]for[-]rehire list maintained by the Department of Human Resources.  This led to the resignation of several senior DWM officials.

(July 15, 2017 OIG Report, Ex. 39 to PSOAF (hereinafter "2017 OIG Report") [170-40] at 2.)[11]

OIG's investigation into DWM resulted in several employee-specific reports, including a March 17, 2017, report on Hansen.  The report stated that "Hansen, using his City email account, sent or received multiple emails in which he used, or the email contained, the words '[n*****]' or 'negro'

---

[11]     Abreu, in further support of his argument that DWM had a culture of racism, submits several statements by City officials or others relating to what they heard or had been told about the culture at DWM.  (*See* PSOAF ¶¶ 65-78.)  Defendant objects to these facts on various grounds, including that the person making the statement lacked personal knowledge, the statements contain inadmissible hearsay, or the testimony is immaterial.  (*See* DSOFR ¶¶ 65-78.)  These objections do not bar consideration of the statements as evidence that at the time City officials made the statements, they were on notice of an unacceptable atmosphere within the DWM.  That said, many of these statements are largely redundant of other facts discussed here, and thus do not alter the court's conclusions (at this stage) regarding Plaintiff's allegations of racism and harassment at DWM.

and included additional disrespectful or hateful content."  (Mar. 17, 2017 Report on Hansen, Ex. 41 to PSOAF (hereinafter "2017 OIG Report on Hansen") [170-42] at 5.)  The investigation also found that Hansen "openly undermined" City policies and "fostered an environment among his DWM subordinates and co-workers that encouraged racism, discrimination, and misogyny."  (*Id.* at 11.)  The report concluded that "Hansen's conduct demonstrates that he does not have the integrity or judgment necessary to be a City employee, and he should be terminated."  (*Id.*)  The City accepted these findings and brought charges against Hansen on May 4, 2017.  (PSOAF ¶ 59.)  Hansen resigned in lieu of discharge on May 11, 2017.  (*Id.*)

In 2017 and 2018, the OIG issued additional investigative reports related to other DWM officials.  (*Id.* ¶ 60.)  Among the findings in the reports were that Murphy and Bresnahan had sent and received racist, sexist, and offensive emails; that Thomas Durkin, DWM General Foreman of plumbers, responded to Hansen's emails with his own racist emails,[12] and was an active participant in the creation of a racist, discriminatory environment at DWM; that DWM Foreman DeCaluwe actively participated in the creation of a racist, discriminatory environment at DWM; and that Jennifer Izban, Assistant to the Commissioner, had received several racist emails and, on at least one occasion, provided an affirming response.  (*Id.*)  In response to these investigations, on dates not specified by the parties, Durkin retired in lieu of discharge, Izban resigned in lieu of discharge, and DeCaluwe was discharged.  (*Id.* ¶ 61.)  Bresnahan resigned in May 2017, and Murphy resigned in June 2017.  (Bresnahan Dep., Ex. 7 to PSOAF [170-8] at 42:20-43:24; Murphy Dep. at 45:13-25.)

On April 15, 2018, the OIG stated that it had concluded its "investigation of racist and sexist emails exchanged among senior-level officials at the [DWM]," and that a change in DWM leadership, "public commitments to combat harassment and discrimination," and "a recent

---

[12]      Plaintiff submitted two such emails that support the report's findings about Durkin; Defendant's 30(b)(6) designee acknowledged that these emails are racially offensive towards Hispanics and Puerto Ricans.  (*See* PSOAF ¶¶ 83-84.)

reported incident in which the Department took swift and decisive action against a senior official after the use of a slur" reflected a "changing culture." (PSOAF ¶ 78; OIG Quarterly Report, First Quarter 2018, Ex. 53 to PSOAF (hereinafter "OIG 2018 Report") [170-54] at 2.)

## V.   Resolution of Abreu's Complaint

On July 24, 2017, the City sent a letter to Abreu notifying him that his EEO complaint was being closed because Hansen was no longer employed by the City. (DSOF ¶ 33.) Defendant admits that the City did not interview any witnesses or take any action to investigate the complaint beyond interviewing Abreu. (PSOAF ¶ 8.) Defendant's 30(b)(6) designee testified that the City did not interview any potential witnesses related to Abreu's complaint because the EEO office was "understaffed" and had a "backlog of cases"; the designee stated that in January 2017 there were "only three investigators and there was no EEO officer," and that by April 2017, they were down to a single investigator. (Pl.'s Pando 30(b)(6) Dep. at 247:1-17, 250:7-16, 252:7-253:7.) The designee also admitted that the EEO did not take any action to protect Abreu from Hansen during the months between Abreu's complaint and Hansen's resignation. (*Id.* at 248:3-9.)

## VI.   Abreu's Discipline and Alleged Retaliation

On August 1, 2017, Mike Dwyer, the Acting District Superintendent, issued a notice of suspension to Abreu for violating two personnel rules on June 1, 2017: failing to wear safety equipment at the job site and sitting in his personal vehicle while on duty. (DSOF ¶ 27.) Hightower testified that on June 1, 2017, he was visiting various work sites, and around 1:30 p.m. he "saw Mr. Abreu sitting down in his vehicle with his regular street clothes on." (Def.'s Hightower Dep., Ex. 37 to DSOF [151-19] at 158:8-11.) According to Hightower, Abreu told Hightower that even though there were two more hours left in the workday (his shift ended at 3:30), it was not worth calling a truck to bring bricks to finish the job because a truck would not come in time. (*Id.* at 158:21-159:4.) But Hightower testified that he himself called to get the bricks, and they arrived at around 2:20 p.m. (*Id.* at 159:5-9.) Hightower told Dwyer about the incident the same day. (*Id.* at 174:13-15.) As noted, Abreu did not receive the notice of suspension for this incident until two

months later. Hightower testified that he believed the delay between the incident and the notice of suspension was attributable to the time it took for a hearing officer to process the write-up. (*Id.* at 174:16-175:2.)[13]

Abreu contests the City's version of events that resulted in his suspension, though there is some overlap between that version and his own. Abreu testified that he and the others stopped working with the bricks at about 2:00 p.m. because they were "40 bricks short" and "it was too late" to call the yard to get more material. (Def.'s Abreu Dep., Ex. 22 to DSOF [151-11] at 202:3-16.) Abreu says he was in his car doing paperwork when Hightower drove up and asked why the brickwork was unfinished; Abreu explained they were 40 bricks short and it was too late to get more. (*Id.* at 202:23-203:12.) Abreu testified that Hightower made a call and the "material got there at 3:10." (*Id.* at 203:12-21.) Abreu testified that the bricks arrived on time only because the driver was obligated to "listen to [Hightower]" because he is "the commissioner," and that "the driver had to give up 20 minutes of his own time because he got back to the yard at ten to 4:00," even though he was "supposed to swipe out at 3:30." (*Id.*) Abreu did admit that he was not wearing his safety equipment, though he explains that this was because he was not on the job site—he was in his "private car." (*Id.* at 206:13-23.)

That Abreu was not disciplined for this event for two months is curious, but his retaliation allegation in this lawsuit is no longer focused on that suspension. Instead, he devotes attention to the atmosphere that he claims arose after he filed his Complaint of race and national origin harassment in this court. Abreu avers that when he arrives at work to receive his assignments for the day, there is opportunity for the workers "to greet each other and engage in small talk." (Abreu Decl., Ex. 57 to PSOAF (hereinafter "Abreu Decl.") [170-58] ¶¶ 4-5.) Abreu states that he is "a friendly person and typically greet[s] [his] co-workers in the yard with 'good morning' and

---

[13] The court is uncertain what role a hearing officer would play before discipline is imposed, nor does it know whether Abreu had an opportunity to present evidence at a hearing before his suspension.

'have a blessed day.'" (*Id.* ¶ 5.) "Prior to the filing of [his] federal complaint," Abreu says, "co-workers would usually respond back to [him] and engage [him] in small talk." (*Id.*)

On March 29, 2019—one day after Abreu filed his Complaint—a news article about it appeared in the *Chicago Tribune*; the title (in the online version of the story) or subtitle (in the print version) stated that a "water department" worker alleged that his "boss tried to throw him in a hole, [and] called him 'dumb Puerto Rican.'" (PSOAF ¶ 85; Exs. to Abreu Decl. [170-58] at 5; News Article, Ex. 6 to DSOFR [186-6] at 1.) The article names Abreu as the water department worker. *See* https://www.chicagotribune.com/politics/ct-met-chicago-water-department-latino-slur-lawsuit-20190328-story.html (last visited April 27, 2022). On the day the article appeared in print, Abreu recalled, he "saw multiple copies of the *Tribune* newspaper folded and open to the article about [him]."[14] (Abreu Decl. ¶ 6.) It was evidently not unusual for Abreu to see stray newspapers at the workplace, but he says that he observed "more copies of the newspaper than is typical on a normal day." (*Id.*) Abreu says that after the article was written, "some of [his] co-workers started ignoring [him] when [he] would greet them in the morning."[15] (*Id.* ¶ 7.) Abreu felt that his co-workers were avoiding him and giving him the "cold shoulder," which was "very hurtful." (*Id.*) Abreu also avers that he heard comments directed toward him such as "stool pigeon" and "snitches get stitches." (*Id.* ¶ 8.) Abreu says he feared Hansen, who he believed "owned guns" and was a "marksman" and would be "vindictive"; as a result, Abreu "moved [to a new home] a couple times in recent years." (*Id.* ¶ 9.)

---

[14]    Defendant notes that the story about Abreu took up about one-third of the page, and that a story about—and picture of—the actor Jessie Smollett (unrelated to this lawsuit) took up about two-thirds of the page. (*See* News Article, Ex. 6 to DSOFR [186-6] at 1.)

[15]    Plaintiff suggests DWM employees knew about Abreu's case, if not from reading the article, then because employees talked to each other about it. (*See* PSOAF ¶ 89.) One DWM employee testified that Abreu's case was discussed within the DWM; Matthew Quinn, the Deputy Commissioner of Operations of the DWM, said that "probably a few years" before the date of his deposition (on November 17, 2020), he became aware of Abreu's lawsuit against the City when he heard "people talking about it." (Quinn Dep., Ex. 56 to PSOAF [170-57] at 1, 9:2-3, 19:4-23.)

Abreu also avers that after he filed his Complaint, when he "called for materials, they would be delivered with the bags of cement ripped open and rocks mixed together with the sand." (*Id.* ¶ 10.) Abreu stated that he "had not experienced this kind of problem with [his] materials before filing [his] federal lawsuit." (*Id.*) To the contrary, before he filed his Complaint, "the materials would be delivered in the truck with the bricks in the back of the truck, sand (for mixing cement) separate, and bags of cement laid on top." (*Id.*) Abreu states that this change, which he perceives to be "sabotage," "made [his] job . . . more difficult" because he had to "pick the rocks out of the sand before mixing it with the cement." (*Id.*)

When it was his turn to serve as "acting foreman," Abreu claims, he "found a dirty sock pinned to the wall by [his] desk at the end of [his] shift." (*Id.* ¶ 11.) Abreu also states that the truck he was assigned as acting foreman was "old" and "beat-up"; he says it had a duct-taped steering wheel, malfunctioning power steering, did not beep when in reverse, and had a hole in the floor. (*Id.* ¶ 12.) Abreu states that he saw new trucks sitting unused in the parking lot, and that on at least one occasion, another acting foreman was assigned one of the new trucks. (*Id.*) There is no evidence that Abreu filed any complaints about these incidents with the EEO Division.

Plaintiff also points to an instance—unrelated to Abreu—where a DWM official communicated hostility toward whistleblowers. In a September 10, 2015, email to several DWM supervisors and superintendents, Bresnahan said that state inspectors had come to DWM work sites, and concluded that there must have been a "whistleblower." (Pl.'s Oct. 13, 2020 Hernandez-Tomlin FED. R. CIV. P. 30(b)(6) Dep., Ex. 15 to PSOAF (hereinafter "Pl.'s Oct. 13, 2020 Hernandez-Tomlin 30(b)(6) Dep.") [170-16] at 37; *id.* at 98:24-99:10.) Bresnahan asked the email recipients to "please let everyone know they have to be perfect . . . [u]ntil we find the rat or they get sick of looking at us." (*Id.* at 37.) Defendant's 30(b)(6) designee acknowledged that this statement is inconsistent with the City's written nonretaliation policy. (*Id.* at 99:22-100:24; PSOAF ¶ 98.)

## VII.    Preventing Racial Harassment at the DWM

The Commissioner of the DWM is ultimately responsible for implementation and enforcement of the EEO Policy.  (PSOAF ¶ 19.)  While the DWM must follow city-wide policies, the Commissioner has authority—within those bounds—to implement new policies or practices, such as those that would address a hostile work environment.  (Moore Dep. at 265:15-566:16; Murphy Dep. at 44:2-45:5.)  The Commissioner of the DWM is responsible for "making sure that all . . . employees are aware of the policy."  (Pl.'s Oct. 13, 2020 Hernandez-Tomlin 30(b)(6) Dep. at 44:9-16.)  Defendant's 30(b)(6) designee testified that "[i]t would be [the Commissioner's] responsibility to . . . be sure all supervisors and managers are following the policy, and it's trickling down to the staff."  (*Id.* at 45:2-6.)

Between 2011 and 2016, Murphy received more than two dozen emails from Hansen that violated the EEO Policy.  (PSOAF ¶ 51.)  Yet Murphy never reported or disciplined Hansen for violating the EEO Policy.  (Murphy Dep. at 156:8-25.)  In fact, the City has no record of any employee in DWM's North District being disciplined for using offensive language or harassing employees based on race or national origin between January 1, 2010, and April 30, 2017.  (PSOAF ¶ 52.)  In his deposition, Murphy admitted that, as Commissioner, he "should have taken more appropriate steps to [rein] in [Hansen's] behavior or do something about it," and he "feel[s] responsible that [he] let it propagate and continue."  (Murphy Dep. at 133:6-18.)  Murphy specifically testified that Hansen should have been disciplined or terminated long before the OIG investigations were made public in May 2017.  (*Id.* at 143:13-144:20.)  And Murphy acknowledged that, given the DWM's knowledge of Hansen's behavior long before 2015, imposing timely discipline may have prevented Hansen's harassment of Abreu.[16]  (*Id.* at 144:8-20.)  Similarly, Defendant's 30(b)(6) designee agreed that when supervisors fail to report discrimination or

---

[16]    As noted above, Murphy also testified that training DWM employees may have prevented harassment of Abreu.  (Murphy Dep. at 144:8-25.)

harassment occurring in the workplace, "they're essentially turning a blind eye to it," which may empower the employee to continue violating the EEO policy. (Pl.'s Pando 30(b)(6) Dep. at 104:2-24.)

## VIII. Procedural History

On June 30, 2017, Abreu filed a discrimination charge with the U.S. Equal Employment Opportunity Commission ("EEOC"), which was cross-filed with the Illinois Department of Human Rights ("IDHR"). (DSOF ¶ 34; POSAF ¶ 101.) In the charge, Abreu alleged that Hansen harassed and discriminated against him because of his race and national origin for "a period of years" leading up to May 11, 2017, when Hansen resigned.[17] (Abreu EEOC Discrimination Charge, Ex. 35 to DSOF [151-17] at 2.)

On May 18, 2018, Abreu filed a second charge of retaliation with the EEOC, which was cross-filed with the IDHR. (DSOF ¶ 39; PSOAF ¶ 102.) In this second charge, Abreu alleged that he was retaliated against for filing the initial charge of discrimination with the EEOC in June 2017. (EEOC Retaliation Charge, Ex. 36 to DSOF [151-18.] at 2.) The first act of retaliation Abreu identified was the August 2017 suspension. Recall that Defendant told Abreu the suspension was for not wearing safety equipment and for sitting in his car, but Abreu claimed there were valid reasons for his actions; that Abreu said that neither he nor anyone he knew "had . . . been disciplined under these circumstances"; and that Commissioner Hightower (who had reported the

---

[17]     Abreu's EEOC charge largely repeated the allegations noted above in his internal EEO complaint with the City, including allegations that Hansen used the epithet "spic." (Abreu EEOC Discrimination Charge, Ex. 35 to DSOF [151-17] at 5.) Abreu also alleged that Hansen told him he was "nothing but a Spanish-speaking [n*****]," and that Hansen said Abreu was "just like those fucking [n******]." (*Id.*) Abreu alleged that Hansen called him a "Pork Chop," which Abreu associated with "the stereotype that Puerto Ricans like pork," and that Hansen told him to "[g]o back to the island. You don't belong here." (*Id.* at 6.) In addition, Abreu alleged that Hansen would yell at him and blow smoke in his face. (*Id.*) Abreu also restated his allegation about the assault at his job site in September 2016. (*Id.* at 6-7.) Abreu further alleged that Hansen had called another employee a "spic" and that Abreu had witnessed Hansen calling several African American employees, including Assistant District Superintendent Bonaparte and Deputy Commissioner Hightower, n******. (DSOF ¶ 37.)

incident to Dwyer) had been interviewed by the DHR about Abreu's charge and "was angry about getting involved."[18]  (*Id.* at 2-3.)

Abreu also alleged that, since the filing of his charge, he has been "retaliated against by being denied use of the vactor machine," which is a machine that "sucks up large amounts of water and muck from the catch basin when a pump will not do the job."  (*Id.* at 3.)  Abreu explains that employees must request use of the machine a day ahead of time, and that before his charge of discrimination, he "had never been denied a request to use the vactor."  (*Id.*)  Since filing the charge, Abreu alleged he had been "denied the use of the vactor 7-9 times."  (*Id.*)

Matthew Quinn, the Deputy Commissioner of Operations, testified that DWM's North District has two to three vactors, and that a Superintendent (in this case, Dwyer) might get involved in assigning the vactor if there are multiple jobs requiring one at the same time.  (Quinn Dep. at 204:9-13, 205:23-206:7.)  But Abreu admitted that he does not know how Dwyer could have become aware that Abreu had filed harassment charges before denying him use of the vactor; Abreu speculated that Dwyer learned about it through gossip.  (DSOF ¶ 58.)

On December 4, 2018, the Department of Justice ("DOJ") issued right-to-sue letters for both the harassment and retaliation EEOC charges; the DOJ did not make any determination on the merits.  (DSOF ¶ 41; PSOAF ¶ 103.)  Abreu filed this lawsuit on March 28, 2019.  (*See* Compl. [1].)

## DISCUSSION

The court will grant a motion for summary judgment only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).

---

[18]    Hightower testified that he was never interviewed by DHR in relation to Abreu's allegations against Hansen.  (Hightower Dep. at 171:24-172:6.)  Abreu testified that Andrew Bonaparte told him that Bonaparte and Hightower were "subpoenaed to go downtown . . . about [his] . . . case." (Abreu Dep. at 205:3-10.)  Bonaparte testified that he "believe[d]" Hightower was interviewed in connection with Abreu's allegations because "[w]hen [Bonaparte] was coming in [to DHR to discuss Abreu's allegations], [Hightower] was leaving out the same building," so Bonaparte "assum[ed]" that Hightower had come for the same reason.  (Def.'s Bonaparte Dep., Ex. 38 to DSOF [151-20] at 59:12-18.)

A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Courts should draw all inferences in favor of the nonmoving party, but a nonmovant is "not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, "the nonmoving party must set forth specific facts showing a genuine issue for trial." *Abrego v. Wilkie*, 907 F.3d 1004, 1011-12 (7th Cir. 2018) (citing *Matsushita*, 475 U.S. at 587).  "If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate." *Boss*, 816 F.3d at 916.

The court comments briefly on several procedural issues before turning to the parties' arguments about the merits of certain claims.  As discussed in Part V, *infra*, the court finds that Abreu has presented insufficient evidence to survive summary judgment on his four retaliation claims (Counts VI, VII, VIII, and IX).  Thus, the court omits or abbreviates discussion of the procedural issues that pertain to those claims, as those issues are moot.[19]

### I.      Procedural Issues Related to the ICRA and IHRA Claims

The parties have spilled a great deal of ink on the question of whether Plaintiff filed timely charges before the state and local agencies; whether doing so is a jurisdictional requirement; if not, whether any timeliness defense has been forfeited; and whether state law shields public officials from liability for their acts in alleged violation of these laws.  These issues are difficult ones but for now need not be addressed in any depth.  If Plaintiff prevails in establishing his claims of retaliation or hostile work environment under Title VII, he will be entitled to compensatory

---

[19]      The court also does not discuss Defendant's unopposed motion for summary judgment on Plaintiff's request for punitive damages; that portion of Defendant's motion is granted.

damages, subject to federal statutory caps. *See* 42 U.S.C. § 1981a(b)(3)(D) (limiting, in this case, the Title VII compensatory damages that Defendant might pay to $300,000). If Plaintiff prevails under § 1981 and/or the Constitution, he will be entitled to compensatory damages without any statutory limitation. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 851 (2001) ("[D]amages awarded under § 1981 are not limited by statute."). There are similarly no statutory limitations to compensatory damages under the ICRA or IHRA. *See Bresnahan v. City of Chicago*, No. 18-CV-1880, 2018 WL 4829597, at *5 (N.D. Ill. Oct. 4, 2018) ("Title VII damages are capped at $300,000, while damages under the Illinois Civil Rights Act are not."); *Glebocki v. City of Chicago*, No. 99 C 1266, 1999 WL 652024, at *2 (N.D. Ill. Aug. 20, 1999) ("The IHRA does not contain an express limitation on damages."). But in total, for all of Abreu's claims, he may "receive only one full compensation for his . . . injuries," because "double recovery for the same injury is not allowed." *Duran v. Town of Cicero*, 653 F.3d 632, 639 (7th Cir. 2011) (citation omitted); *see Smith v. Bd. of Educ. for Waukegan Pub. Sch. Dist. # 60*, No. 20-CV-03069, 2021 WL 4459529, at *8 (N.D. Ill. Sept. 29, 2021) (holding that the plaintiff cannot "recover twice," under Title VII and the ICRA, "for the same harm"). As Abreu is alleging the same harms under each cause of action—hostile work environment and retaliation—it may well be unnecessary for the court to resolve issues that are specific to Abreu's state-law claims. If the need does arise, the court will, at that point, consider whether Defendant's arguments about the ICRA and IHRA limit Abreu's compensatory damages; as these issues do not involve contested facts, the court can resolve them after the jury has returned a verdict.

## II.     Statute of Limitations

Defendant next argues that a number of Plaintiff's claims are limited by the applicable statutes of limitation. Defendant contends that while Counts I, II, III, IV, and V were filed within the limitations period, Plaintiff is barred from pursuing those claims to the extent they arise from conduct that occurred prior to the limitations period. (Def.'s Mem. [149] at 27-29.) As support, Defendant notes that the Seventh Circuit has held that "[w]here a pattern of harassment spreads

out over years, and it is evident long before the plaintiff sues that she was a victim of actionable harassment, she 'cannot reach back and base her suit on conduct that occurred outside the statute of limitations.'" *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999) (quoting *Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1167 (7th Cir. 1996)). But three years after *Hardin*, the Supreme Court held in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002), that "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." The Court stated that "[a]lthough many of the acts upon which [the plaintiff's] claim depends occurred outside the 300 day filing period [for claims under Title VII], [the Court] cannot say that they are not part of the same actionable hostile environment claim." *Morgan*, 536 U.S. at 120-21. The Court thus affirmed the lower court's decision to include those acts in its consideration of the plaintiff's claim, under what is known as the "continuing violation doctrine." *Id.* at 106-07, 121. The Seventh Circuit has since applied the continuing violation doctrine to hostile work environment claims. *See, e.g.*, *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 768 (7th Cir. 2007). The only case Defendant cites that postdates *Morgan* and involves a claim of hostile work environment is *Randle v. Chase Bank*, No. 1:13-cv-1503-JEH, 2018 WL 846047, at *7 (C.D. Ill. Feb. 13, 2018), in which the court cited *Hardin* and limited the plaintiff's claim to conduct that occurred within the limitations period. This court respectfully disagrees with *Randle*, which is not binding and is in tension with *Morgan*. Since all of the acts Abreu alleges are part of the same hostile work environment, and all of Abreu's claims include at least one act within the time period, Abreu's claims are not limited by the reasoning in *Hardin*.[20]

---

[20] Defendant also argues that the Illinois Tort Immunity Act ("ITIA") imposes limits on certain non-federal claims. (Def.'s Mem. at 29.) For the reasons discussed above, the court declines to reach the ITIA arguments at this juncture.

### III.     Retaliation Claims

Defendant next argues that Plaintiff's retaliation claims (Counts VI, VII, VIII, and IX) fail as a matter of law.[21]  (Def.'s Mem. at 15-18.)  To prove retaliation under Title VII, Abreu must show that "(1) he engaged in protected activity, (2) he suffered a materially adverse employment action, and (3) there was a causal link between his protected activity and the adverse action."  *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 862 (7th Cir. 2015).   These standards apply to Plaintiff's other retaliation claims as well.  *See Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (IHRA); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007) (§ 1981), *aff'd*, 553 U.S. 442 (2008); *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003) (Fourteenth Amendment Equal Protection); *Cary v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 19 C 03014, 2020 WL 1330654, at *5 (N.D. Ill. Mar. 22, 2020) (ICRA).

That Plaintiff engaged in protected activity is undisputed.  He made an internal complaint, filed charges with the EEOC, and ultimately filed a federal lawsuit.  Although Abreu presented evidence of adverse actions following those activities, Abreu has now limited his retaliation claim to conduct that post-dates the filing of this lawsuit, for reasons not entirely clear to the court.  (*See* Resp. [169] at 24 n.7.)  For reasons also not clear to the court, Defendant objects to Abreu's "elect[ion] to narrow his retaliation claims to actions arising after the filing of his federal complaint in 2019, and not actions arising from the filing of his administrative charges in 2017."  (*Id.*)  Defendant is correct that Abreu's "actual pleadings . . . unequivocally state" that his protected activity was filing his charge with the EEOC and IDHR.  (Reply [185] at 21.)  Some 20 paragraphs of his Complaint describe two acts of retaliation that followed (and were allegedly in response to) the EEOC charge: Abreu's 2017 suspension, and an incident where Dwyer (Hansen's successor) denied Abreu the use of certain equipment.  (SAC ¶¶ 75-94.)  But the Complaint also includes

---

[21]      Defendant also argues that Plaintiff's ICRA retaliation claim (Count VIII) fails because the ICRA does not support a retaliation theory.  (Def.'s Mem. at 14-15.)  As Count VIII fails for the reasons discussed here, the court does not reach this argument.

allegations that "[t]he Water Department subjected Abreu to a hostile work environment in retaliation for his protected activity." (SAC ¶ E(iii).) Those paragraphs include allegations that "[s]hortly after Abreu filed his Complaint in federal court," he was ignored and ostracized by coworkers, was called a "stool pigeon" and warned that "snitches get stiches," was subjected to frequent sabotage of his work materials, and received unequal treatment as an acting foreman. (SAC ¶¶ 95-99.) The Complaint thus adequately alleges retaliation for filing this federal lawsuit.

Defendant contends, in addition, that Abreu has not presented evidence of any "materially adverse actions." (Reply at 22.) For purposes of a retaliation claim, a "materially adverse" action is simply one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). As Plaintiff emphasizes, the court "can examine the adverse actions collectively" when applying this legal standard. (Resp. at 25; *see Boss v. Castro*, 816 F.3d 910, 920 ("We consider the [retaliatory] hostile work environment claim under a totality of the circumstances approach." (internal quotation marks omitted); *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 483 n.7 (7th Cir. 1996) (recognizing "the possibility that another plaintiff might have a cognizable claim of retaliation based on acts which, although seemingly appropriate and nondiscriminatory when considered in isolation, bespeak retaliation when considered together"); *Pesek v. Caterpillar Inc.*, No. 10 C 3546, 2012 WL 3069773, at *4-5 (N.D. Ill. July 27, 2012) (citing *McKenzie* and evaluating "the allegedly retaliatory actions collectively as a single campaign of harassment").) In arguing that the alleged incidents are not materially adverse, Defendant largely does not contest Plaintiff's evidence or offer competing evidence. And the court agrees with Abreu that his evidence—particularly that relating to his compromised work materials, which undermined his ability to perform work obligations—largely distinguish this case from those cited by Defendant, which involved "petty slights." (Def.'s Mem. at 17-18, 18 n.6.)

But Abreu's effort to hold the City responsible for this retaliation fails for a different reason: much (or possibly all) of the conduct he identifies as having occurred after filing this lawsuit

appears to have that of his coworkers. To establish that he was "subjected to a hostile work environment because of his complaints" (SAC ¶ 95), Abreu must present a basis for employer liability. *See Flanagan v. Off. of Chief Judge of Cir. Ct. of Cook Cnty.*, 893 F.3d 372, 375 (7th Cir. 2018); *Boss*, 816 F.3d at 920 (7th Cir. 2016). Under Title VII, an employer may be strictly liable for the acts of a supervisor; in cases involving coworker harassment, the employer is liable only if the employer acted negligently in discovering or investigating the retaliatory acts. *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017). Thus, for Plaintiff's retaliation claims to survive summary judgment, Plaintiff must show that Defendant was (at a minimum) negligent in discovering or addressing the incidents of coworker retaliation.

Abreu has not offered any such evidence. Abreu avers that his coworkers ostracized him and called him names after he filed his lawsuit in March 2019, but he offers no evidence that his supervisor (or other officials at DWM) observed or otherwise learned about this behavior; he does not say, for example, that he complained to the EEO Division about it. Similarly, Abreu avers that his work materials were "sabotaged" when he called for additional materials to be delivered. Abreu does not say so specifically, but the court presumes that he blames the coworkers who transported the material. Abreu also does not say who distributed extra newspapers folded open to the news article about him, nor does he identify the person[s] who pinned a sock to the wall when he was an acting foreman. The only incident discussed by Abreu that appears likely to have involved a supervisor was when an unnamed person assigned him an old, beat-up truck. Even assuming that this lone incident has a basis for employer liability, Abreu has not explained how it, on its own, is materially adverse.[22]

---

[22] There are also critical problems in determining whether this and other incidents are causally connected to Abreu's lawsuit. Causation is impossible to determine where Abreu does not identify the person engaged in the retaliation, let alone explain their position at DWM. Among other things, the offender may not have been present on the day the newspapers were folded open to the article about Abreu, and thus may have no idea that Abreu ever filed a lawsuit.

There may be a basis for the argument that Defendant *should have* been aware of this retaliatory conduct and taken action to stop it. But Abreu's evidence does not support such an argument. He has not demonstrated, for example, that he was deterred from complaining to DWM about the coworker retaliation. Abreu's evidence that Hansen was in frequent communication with upper management (who were complicit in sending and receiving racist emails), or his evidence that complaining about such emails may be risky or futile, is not clearly relevant to a potential EEO complaint Abreu would have made in 2019—long after Hansen's departure—that coworkers were harassing him for filing a federal lawsuit.[23] Abreu has not offered evidence that Defendant had a practice of ignoring or failing to investigate complaints of retaliation, or that anyone else at DWM ever suffered retaliation from coworkers after filing a lawsuit. In fact, the evidence suggests that DWM overhauled its policy and personnel before the alleged retaliation began, which might suggest that Defendant was equipped to resolve a complaint (if Abreu had made one). For example, the evidence in the record showing that the EEO Division was understaffed dates to 2016; there is no evidence that understaffing persisted in subsequent years. Annual EEO training for all employees became mandatory in 2017. At some point in 2017 or 2018, several DWM officers resigned, retired, or were discharged. And on April 15, 2018, the OIG stated that it had concluded its investigation and that DWM's change in leadership, its public commitments to combat harassment, and "a recent reported incident in which the Department took swift and decisive action against a senior official after the use of a slur" reflected a "changing culture."[24] (OIG 2018 Report at 2.) Abreu has not provided evidence

---

[23] Abreu also submits certain statements from DWM employees who feared speaking up due to the "retaliation . . . going on right now." (*See* PSOAF ¶ 71(d).) These statements, made at a City Council meeting in 2018, are hearsay. It is also not clear that these statements pertain to situations like Abreu's: coworker harassment following the filing of a federal complaint in 2019.

[24] This finding of a changing culture also weakens the potential relevance of the email from Bresnahan in 2015 about finding a whistleblower, or "rat." Bresnahan resigned in June 2017, and there is no other evidence that, by 2019, DWM had a culture of targeting employees who made complaints about coworkers.

that in and after March 2019, Defendant was negligent in discovering and redressing retaliation by Abreu's coworkers.  For that reason, the court grants summary judgment on Counts VI, VII, VIII, and IX.

## IV.    *Monell* Liability

Defendant argues that Abreu's hostile work environment claims brought under § 1983 (Counts III and IV) fail because there is no basis for *Monell* liability.  The Supreme Court held in *Monell v. Department of Social Services*, 436 U.S. 658, 691-92 (1978), that local governments are liable for constitutional violations only when they themselves cause the deprivation of rights. Thus, unlike for claims brought under Title VII, a municipal defendant cannot be held liable based on principles of vicarious liability.  *See Monell*, 436 U.S. at 694-95.  For Abreu to show that the City of Chicago is responsible for a hostile work environment, Abreu must show that his alleged injuries resulted from "an express policy," an "informal but established municipal custom," or "the action of a policymaker authorized to act for the municipality."  *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1125 (2021).

Abreu does not argue that Defendant has an "express policy" permitting a hostile work environment.  In fact, Defendant's EEO Policy and Personnel Rules prohibit harassment and discrimination based on race and national origin.  But Abreu alleges that there are important gaps in that policy, such as training not becoming mandatory until after the OIG report exposed wrongdoing.  Abreu also alleges that Defendant had a widespread practice of permitting and condoning racist conduct at DWM, which undermines Defendant's assertion that its EEO rules accurately reflect City policy.

It can be "more confusing than useful to distinguish between claims about express policies that fail to address certain issues, and claims about widespread practices that are not tethered to a particular written policy."  *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005); *see Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021) (recognizing the challenges that parties face in asserting and defending claims under § 1983).  The key for a plaintiff in either

instance is to locate "evidence [showing] that there is a true municipal policy at issue, not a random event." *Calhoun*, 408 F.3d at 380. "If the same problem has arisen many times and the municipality has acquiesced in the outcome," the court may "infer that there is a policy at work." *Id.; see Jackson v. Marion County*, 66 F.3d 151,152 (7th Cir. 1995) ("The usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers."). The Seventh Circuit has not established any bright-line rules for how frequently such conduct must occur before labeling it a "practice," though it has held that there "must be more than one instance." *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). The Seventh Circuit has also warned against overstating Plaintiff's burden: "[T]o survive summary judgment, a plaintiff need not present a full panoply of statistical evidence showing the entire gamut of a defendant's past bad acts to establish a widespread practice or custom. Instead, it is enough that a plaintiff present competent evidence tending to show a general pattern of repeated behavior (*i.e.,* something greater than a mere isolated event)." *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006).

The court concludes Plaintiff has done so here. Defendant argues that four sustained EEO complaints between 2010 and 2017 involving race or national origin harassment are the only evidence produced by Plaintiff relevant to whether Defendant had a practice of permitting and condoning racial harassment. (Def.'s Mem. at 23.) But in light of the rest of the evidence in the record, the fact that there were just four sustained complaints is troubling in that it may well be a reflection of the very culture of discrimination that Plaintiff alleges. As discussed above, Commissioner Murphy stated that he knew Hansen used racially derogatory language—including toward DWM employees—since at least 2009. Hansen also made clear in an email to Murphy, Egan, and other officials that the EEO Policy did not apply to him—an explicit indication that

Hansen knew his actions violated the policy and that he had no reason to fear any repercussion. And, of course, there are the numerous emails that Hansen sent to top officials, in which Hansen freely communicated his racist thoughts and intentions, including deeply offensive statements about Hightower, Hansen's own African American supervisor.

Defendant argues that Hansen's emails are not relevant because they "were sent to select DWM employees, not with the intent to harass the recipient based on race or national origin, but to share offensive content with like-minded individuals in private communications unrelated to any employment decisions and misguidedly meant to be humorous." (Def.'s Mem. at 23.) Defendant thus believes the emails are "not evidence from which a reasonable jury could find a municipal policy of racist behavior and attitudes." (*Id.*) The court disagrees.

Defendant does not contest the fact that by sending these emails, Hansen knowingly violated EEO policy that prohibited discriminatory conduct. Whether Hansen or others also found the emails to be humorous is largely beside the point. And while Defendant notes that only "select employees" received the emails, those employees included DWM's top officials—those with the responsibility and power to set DWM culture and enforce DWM rules.[25] Defendant nevertheless argues that "[i]t is quite the stretch to argue that a natural consequence of permitting an employee to use racially and ethnically-offensive language in private emails" will lead to harassment. (Reply at 30.) From the court's perspective, this is no "stretch" at all. To the contrary, it is Defendant's position that strains credulity; a jury could certainly find that Hansen's use of vile and offensive language, over the course of many years, would be expected to extend beyond emails he was sending to his superiors, and filter into the interactions Hansen had with coworkers and subordinates. One such indicator that this would happen was the fact that Hansen's emails often named DWM employees as the subject of his racist musings, such as when Hansen referred to

---

[25] Since the court determines that Plaintiff survives summary judgment on the widespread practice prong of *Monell*, the court does not reach the parties' arguments concerning whether Defendant may be held liable on the basis of Murphy acting as a "final policymaker."

Woodward as a "militant African American" who would throw "half peeled bananas" at him, or the many emails that Hansen sent regarding Hightower (who Hansen and others referred to as "diddy"). Another indicator was that Hansen made decisions about when and where his crew would work based on the race of the alderman or the racial makeup of a ward.

The discriminatory conduct revealed by Hansen's emails is sufficiently similar to Abreu's allegations even if, as Defendant argues, DWM employees were not directly harmed. Defendant "fails to appreciate the difference between showing repeated past bad *acts* versus repeated past *injuries*." *Davis*, 452 F.3d at 695. For Abreu to "establish a widespread custom or policy," he does not need to show that Hansen's racist language "actually caused pain and suffering" to other DWM employees. *Id.* It is enough that the emails evince a culture of racism at DWM that could lead to—and allegedly did lead to—an employee's experiencing a hostile work environment.

In any event, here there is evidence in the record that Hansen's racist conduct *did* injure employees beyond Abreu. As noted above, Jimenez testified that Hansen mocked his speech, referred to him as "Puerto Rican" or "dumb Puerto Rican," and yelled at him to get his attention. Jimenez tried to report this conduct to Bresnahan and Murphy, but they did nothing. Feeling that any further action was futile, Jimenez left the matter there; he did not submit a complaint to the EEO Division (which he did not know was possible) and Hansen was not disciplined.

Jimenez's failure to report Hansen's conduct confirms the court's view that the lack of sustained complaints in the record is no defense in this case, in light of substantial evidence that the complaint process itself was compromised.[26] To begin, EEO training was optional until 2017,

---

[26]     The court agrees with Defendant that this case is not precisely analogous to *J.K.J.*, in which the Seventh Circuit based *Monell* liability on the defendant's policy of inaction in the face of known risk. *J.K.J.*, 960 F.3d at 384. The plaintiffs in *J.K.J.* were part of a highly vulnerable population—female inmates supervised by male guards—that is not analogous to the workforce at DWM. *See id.* The plaintiffs' vulnerability was important context in that case because "the path to *Monell* liability based on inaction is steeper," given that "a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous." *Id.* at 378. As discussed above, this case involves more than a mere failure to act; the evidence in the record suggests that there was a widespread practice of racist conduct at DWM, which began many years prior to Abreu's allegations. Unlike in *J.K.J.*, Defendant's omissions here are not the

and by all indications, it was sparingly utilized. In her 2014 email to DWM management, Egan (the DWM's EEO liaison) conveyed her lack of confidence in DWM's training process, writing: "Good grief. There does not seem to be much of a plan in place." (Egan Email at 1.) And Defendant admitted that, prior to 2017, a workable plan was not developed; as noted above, Bonaparte was the only DWM employee trained on the policy between 2010 and 2017.

EEO training might have been helpful in informing Jimenez and others that they had the ability to report Hansen's conduct in ways other than complaining to Bresnahan or Murphy. But there were obstacles to blowing the whistle on Hansen's conduct that go beyond the absence of this training. As noted, the EEO Division was understaffed during the time period that Abreu alleges he was harassed, and investigations were put on hold without regard to whether a complaint was likely to be sustained. It appears, as well, that employees declined to report on Hansen, even if they had evidence of wrongdoing. The example of Deputy Commissioner Anderson is instructive; Commissioner Conner's decision not to discipline Anderson for failing to report racist emails was based on the fact that the emails included top-level management, and thus her fear of retaliation was credible. Such retaliation would be possible because, as Defendant admitted, investigations were not kept confidential. Deputy Commissioner Hightower and the City's 30(b)(6) witness confirmed Abreu's suspicion that if employees were to complain about Hansen, Hansen would find out. These many factors—the lack of training, the lack of staffing for investigations, the lack of confidentiality, and Hansen's apparent close connection to top management (who themselves were indifferent, at the very least, to the language Hansen used)—support a reasonable inference in Abreu's favor that the low number of sustained complaints of racial harassment in the record is not an accurate reflection of DWM's culture.

Defendant also argues that a widespread practice of permitting racial harassment, such as that experienced by Abreu, is too general to form a basis for *Monell* liability. Defendant's only

---

sole basis for liability, but rather help to explain *why* Hansen and others felt free to engage in unlawful conduct.

citation for that assertion is *Mitchell v. Village of Dixmoor*, No. 20 C 436, 2021 WL 25542, at *3 (N.D. Ill. Jan. 4, 2021), in which the court held that the plaintiffs' description of a "culture of lawlessness" in their complaint was equivalent to alleging "illegality in general," which is not a "policy" or "custom" for the purpose of *Monell* liability. In dismissing the plaintiffs' claim, the court found that the lack of any "cogent narrative" left the defendant without "fair notice of what it did wrong." *Mitchell*, 2021 WL 25542, at *3-4. Abreu's allegations of a racially offensive hostile work environment are distinguishable from *Mitchell*. Abreu alleges a clear pattern of racial discrimination by Hansen and others that went unaddressed—and therefore was effectively condoned—by Defendant for years before the OIG issued its report in 2017.[27] In sum, there is sufficient evidence in the record of a widespread practice of unlawful activity, which can be a basis for liability under *Monell*, for Abreu to survive summary judgment on these claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [148] is granted with respect to the claim for punitive damages. It is granted, in addition, as to Counts VI, VII, VIII, and IX, and denied as to Counts I, II, III, IV, and V.

ENTER:

Dated: May 10, 2022

REBECCA R. PALLMEYER
United States District Judge

---

[27] Defendant does not argue that Abreu cannot show a causal link between the widespread practice of racist conduct and Abreu's specific injury. In any event, there is sufficient evidence in the record—including Defendant's failure to discipline or terminate Hansen (or others) and Defendant's decision not to improve its EEO training and complaint process—for Plaintiff to survive summary judgment at this juncture.